**AMERICAN DEPOSIT CORPORATION, and Blackfeet National Bank, Plaintiffs,**

**v.**

**James W. SCHACHT, individually and as Acting Director of Insurance of the State of Illinois, Defendant.**

No. 95 C 207.

United States District Court, N.D. Illinois, Eastern Division.

May 24, 1995.

Robert A. Knuti, Lord, Bissell & Brook, Chicago, IL, Eugene F. Assaf, Kirkland & Ellis, Washington, DC, David O. Stewart, Ropes & Gray, Dennis M. Gingold, Anderson, Aukamp & Gingold, Washington, DC, Douglas J. Kurtenbach, Kirkland & Ellis, Chicago, IL, Thaddeus Holt, Point Clear, AL, for plaintiffs.

Thomas A. Ioppolo, Andrew Neal Levine, Asst. Atty. Gen., Illinois Atty. General's Office, Daniel I. Schlessinger, Damon Nicholas Vocke, Robert A. Knuti, Lord, Bissell & Brook, Chicago, IL, for defendant.

Ann M. Kappler, Jenner & Block, Chicago, IL, for NALU.

### MEMORANDUM ORDER

BOBRICK, United States Magistrate Judge.

Before the court are the cross-motions of plaintiffs American Deposit Corp. ("ADC") and Blackfeet National Bank, ("Blackfeet"), and defendant James W. Schacht, Acting Director of Insurance of the State of Illinois, ("Schacht"), for summary judgment. The American Council of Life Insurance ("ACLI") and the National Association of Life Underwriters ("NALU") have filed briefs as *amici curiae*.

### I. *BACKGROUND*

ADC has developed a new investment vehicle, referred to as a Retirement Certificate of Deposit ("Retirement CD"), which, while having traditional features of a certificate of deposit, also contains terms and features of an annuity. (*Complaint* at 20–22). ADC licensed the Retirement CD, for offering and sale, to Blackfeet, a National Banking Association organized and operated pursuant to the National Bank Act, Title 12 U.S.C. § 21 *et seq* ("Bank Act").

In 1994, Blackfeet began to market the Retirement CD, in a rather limited fashion, in Illinois by sending informational packets to ten persons who requested them. Blackfeet did not, and has not, accepted any deposits from Illinois residents. Since the Retirement CD had annuity-like features ordinarily associated with life insurance, Schacht issued a cease and desist order against Blackfeet and ADC, and scheduled a hearing to investigate whether Blackfeet and ADC were engaging in insurance activities subject to state regulation. ADC and Blackfeet, in response to Schacht's order, filed a complaint on January 11, 1995, seeking injunctive and declaratory relief against Schacht. The Complaint contends that the Bank Act authorizes the offering of the Retirement CD, and that the Supremacy Clause and the Dormant Commerce Clause prohibit Schacht's actions to regulate the offering of the Retirement CD. Both parties have filed motions for summary judgment in this case, essentially asking the court to determine whether the Retirement CD is an insurance-type instrument subject to state regulation or a certificate of deposit which, under the Bank Act, would be outside state regulation. The parties have filed the requisite statements of undisputed facts under Local Rule 12, but this case really turns on the characterization of the Retirement CD under applicable law.[1] Accordingly, we begin our analysis with an outline of the statutory framework the parties have placed in issue, and then review the terms of the Re-

---

1. Indeed, were we to treat this as a normal motion for summary judgment, Schacht's motion could readily be denied. Under Local Rule 12(m)(3), a party moving for summary judgment must submit a statement that includes the facts that the moving party contends entitle it to judgment. Review of Schacht's submission fails to reveal an allegation—let alone a fact—that Blackfeet has done or attempted to do business in the state of Illinois. Such an element would

tirement CD along with the characterizations of the instrument the parties have offered.

### A. *Statutory Framework*

The parties' dispute stems from the tension between federal banking law, as embodied in the Bank Act, and Illinois' regulation of the insurance industry. Under the McCarran–Ferguson Act, 15 U.S.C. §§ 1011 *et seq.*, state laws enacted "for the purpose of regulating the business of insurance" are exempted from traditional federal preemption principles. 15 U.S.C. § 1012(b)[2]. The statute was enacted in 1945 in response to the Supreme Court's decision in *United States v. South–Eastern Underwriters Assn.*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), in which the Court first held that the business of insurance was interstate commerce subject to the coverage of the Sherman Act.[3] Congress's primary concern in enacting the legislation was to ensure states would continue to have the ability to tax and regulate the business of insurance without fear of Commerce Clause attack. *Group Life & Health Ins. v. Royal Drug Co.*, 440 U.S. 205, 217–218, 99 S.Ct. 1067, 1076–77, 59 L.Ed.2d 261 (1979). The McCarran–Ferguson Act "overturn[ed] the normal legal rules of preemption" by imposing a rule "that state laws enacted for the purpose of regulating the business of insurance do not yield to conflicting federal, statutes unless a federal statue specifically

requires otherwise." *U.S. Dept. of Treasury v. Fabe*, —— U.S. ——, ——, 113 S.Ct. 2202, 2211, 124 L.Ed.2d 449 (1993). The parties' discord, understandably, involves the issue of whether the Retirement CD falls within the business of insurance thereby subjecting it to state regulation.

As a national bank, Blackfeet is incorporated, organized, and chartered exclusively under the Bank Act. Its main office is located in the town of Browning, Montana, on the Blackfeet Indian Reservation. The plaintiffs argue that the Bank Act provides the sole authority under which they need operate. The Bank Act authorizes national banks such as Blackfeet to receive "deposits" as part of the exercise of "such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24 (Seventh). The Office of the Comptroller of the Currency ("OCC"), the administrator of the Bank Act, has characterized the Retirement CD as a new form of "deposit." (*See infra* at 1071). Essentially, the plaintiffs argue that the Bank Act preempts state regulation of national banks as Schacht attempts in this case, and that Schacht's efforts to regulate the Retirement CD are invalid under the Supremacy Clause.

The State of Illinois regulates the insurance industry under the Illinois Insurance Code, 215 ILCS 5/1 *et seq.* ("Insurance Code"). The Insurance Code includes "annuity contracts" in its definition of life insur-

have to be a salient feature of Schacht's case since we do not understand the state of Illinois to presume to regulate the insurance industry outside its borders. The court, however, need not assume the existence of any facts to support a party's position in a summary judgment proceeding. *See Schulz v. Serfilco, Ltd.*, 965 F.2d 516, 519 (7th Cir.1992).

2. The statute provides, in relevant part:

Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent such business is not regulated by state law.

3. Prior to the *South–Eastern* holding, "[issuing] a policy of insurance [was] not a transaction of commerce." *Paul v. Virginia*, 75 U.S. 168, 8 Wall. 168, 183, 19 L.Ed. 357 (1869).

ance, 215 ILCS 5/4 [4], but offers no definition of annuity or annuity contract. The Illinois Department of Insurance has determined that the Retirement CD is within the definition of life insurance and annuities and, therefore, is subject to regulation under the Insurance Code. Pursuant to the Insurance Code, the Department of Insurance issued a "cease and desist" order to Blackfeet, charging that it was conducting insurance business without authority and without first procuring a certificate of authority in violation of 215 ILCS 5/121. Under that provision, it is "unlawful for any company [including an association, such as Blackfeet, under 215 ILCS 5/2(e) ] ... to transact insurance business in this State, without a certificate of authority from the director ..." The Insurance Code provides for the issuance of a certificate of authority to domestic companies, 215 ILCS 5/24; 5/51, or foreign or alien companies. 215 ILCS 5/111. Domestic companies are those organized under the laws of the state of Illinois. 215 ILCS 5/2(f). A foreign company is one organized under the laws of any other state or territory of the United States, or the District of Columbia. 215 ILCS 5/2(g). An alien company is one organized under the laws of a country other than the United States. 215 ILCS 5/2(h). Organized under the Bank Act, Blackfeet does not qualify as a domestic, alien, or foreign company, which would lead one to believe that there are no circumstances under which it could receive a certificate of authority, even if it were to submit to the administrative hearing and agree to comply with the Insurance Code. There is another provision in the Insurance Code, however, that allows a national bank located in a town of 5000 or less—such as Blackfeet—to register with the director in order to transact insurance business as an insurance *agency* in Illinois. 215 ILCS 5/499.1(a); 215 ILCS 5/499.1(e).[5] Yet another provision that would appear to be an insurmountable hurdle for Blackfeet states that companies that engage in other business in addition to the life insurance business may not be certified to transact insurance business under the Insurance Code. 215 ILCS 5/111(c). A bank such as Blackfeet obviously engages in many federally-authorized banking activities that would violate this provision.

The Insurance Code, then, includes a certain amount of seeming incongruities, when the facts of this case are considered, that the parties have had some difficulty resolving. Essentially, it would appear that a national

4. The statute defines life insurance broadly, as follows:

(a) Life. Insurance on the lives of persons and every insurance appertaining thereto or connected therewith and granting, purchasing or disposing of annuities. Policies of life or endowment insurance or annuity contracts or contracts supplemental thereto which contain provisions for additional benefits in case of death by accidental means and provisions operating to safeguard such policies or contracts against lapse, to give a special surrender value, or special benefit, or an annuity, in the event, that the insured or annuitant shall become totally and permanently disabled as defined by the policy or contract, or which contain benefits providing acceleration of life or endowment or annuity benefits in advance of the time they would otherwise be payable, as an indemnity for long term care which is certified or ordered by a physician, including but not limited to, professional nursing care, medical care expenses, custodial nursing care, non-nursing custodial care provided in a nursing home or at a residence of the insured, or which contain benefits providing acceleration of life or endowment or annuity benefits in advance of the time they would otherwise be payable, at any time during the insured's lifetime, as an indemnity for a terminal illness shall be deemed to be policies of life or endowment insurance or annuity contracts within the intent of this clause.

Also to be deemed as policies of life or endowment insurance or annuity contracts within the intent of this clause shall be those policies or riders that provide for the payment of up to 25% of the face amount of benefits in advance of the time they would otherwise be payable upon a diagnosis by a physician licensed to practice medicine in all of its branches that the insured has incurred one of the covered conditions listed in the policy or rider.

5. This provision essentially echoes Section 92 of the Bank Act, which allows national banking associations located and doing business in towns with populations of no more than 5,000 "under such rules as may be prescribed by the Comptroller of the Currency, [to] act as agent for any fire, life, or other insurance company authorized by the authorities of the State in which said bank is located to do business in said state, by soliciting and selling insurance and collecting premiums on policies issued by such company ..." 12 U.S.C. § 92.

bank could act as an *agent* for insurance products, but could not *underwrite* insurance risks as would an insurance company. In supplemental briefing in this matter, Schacht has submitted that the practical effect of these regulations is that the only way Blackfeet could sell and underwrite the Retirement CD—should the instrument qualify as insurance—is to set up a subsidiary for that purpose. Plaintiffs point out that such a requirement demonstrates that the Insurance Code discriminates against national banks such as Blackfeet. The applicability of this or any other requirement under the statutory framework, of course, is wholly dependent on the nature of the Retirement CD.

### B. *Terms of the Retirement CD*

Blackfeet promotional materials (*Plaintiff's Memorandum in Support of its Motion for Summary Judgment ("Pl. MSJ")*, Ex. 3), describe the terms and conditions of the Retirement CD. The customer is required to open the Retirement CD with an minimum initial balance of $5000. At that time the Customer also selects a Maturity Date, which is often the customer's expected retirement. Interest, calculated under a formula tied to the then current five-year, U.S. Government Treasury Note yield, begins to accrue from the date of deposit. Under applicable IRS regulations, this interest is designed to be tax deferred. The initial rate is in effect for one year, and is subsequently adjusted every five years. Prior to the Maturity Date, withdrawals are subject to penalty and IRS treatment as taxable income. On the Maturity Date, the customer may make a cash withdrawal in the amount of ⅔ of the account balance. Thereafter, the customer's lifetime Scheduled Monthly Withdrawal Payments will begin. The amount of the monthly payment is to be determined by the balance of the account after Maturity Date, the age of the customer, the monthly payment interest rate then in effect, and the Society of Actuaries annuity table. Once determined, the monthly payments to the customer will remained fixed over the customer's lifetime. For tax purposes, the payments will be apportioned from interest and principal. The FDIC, however, will only insure an amount equal to the customer's deposits and accrued interest; the total amount of lifetime monthly payments might exceed that amount but, once they do, they are not FDIC-insured.

### C. *Expert Characterizations of the Retirement CD*

Each side to this dispute is armed with expert interpretations as to the nature of the Retirement CD. We begin our review of these with the OCC Interpretive Letter holding that the Retirement CD is within the powers of banks under the Bank Act under 12 U.S.C. § 24 (Seventh). (*Pl. MSJ*, Ex. 1). Essentially, the OCC felt that the offering of the Retirement CD was consistent with a bank's authority to receive deposits and to incur liabilities and to fund its operations. (*Id.* at 2–3). The OCC viewed the Retirement CD as a single financial product with a total return of the sum of (1) interest accrued until maturity, (2) the portion of the monthly, post-maturity payments allocable to interest, and (3) the amount of those monthly payments occurring after the return of the maturity balance. (*Id.* at 7). The OCC noted that, should the customer continue to live after the maturity balance was exhausted by monthly payments, the customer would nevertheless continue to receive monthly payments at the fixed rate. (*Id.*) The OCC referred to these payment as "nothing more than additional interest." (*Id.*). One of the conditions the OCC set for the offering of the Retirement CD was that Blackfeet mitigate the "risk of paying interest throughout the life of each [customer] even in situations where the maturity balance becomes exhausted," with consideration given to purchasing commercially available annuities from insurance companies to fund this obligation. (*Id.* at 8). Blackfeet was to submit its plan regarding such mitigation to the OCC. (*Id.*).

While the OCC did not object to the offering of the Retirement CD, neither did it "approve" it. In a letter to the Chairman of the House Energy and Commerce Committee, Congressman John D. Dingell, the OCC indicated that the Retirement CD could be offered without OCC approval since it was within the powers of a national bank. (*Memorandum of Law of ACLI*, Ex. 8). The OCC stressed that its "no-objection" opinion was

based solely on a determination of the bank's authority to conduct the business of banking. (*Id.* at 1–2). The OCC conceded that the Retirement CD possessed characteristics of an annuity, but did not comment on whether banks could underwrite annuities. (*Id.* at 2). In addition, the OCC allowed that state regulatory officials might conclude that insurance laws apply to the Retirement CD. (*Id.*). While the OCC did not address any state law requirements, it stated that the Blackfeet would be required to comply with all applicable state laws and regulations. (*Id.* at 4). The OCC would not comment on the preemptive effect of the Bank on state insurance law in the context of the Retirement CD.

The FDIC also offered its opinion as to the nature of the Retirement CD in order to determine whether it was a deposit entitled to FDIC insurance. (*Pl. MSJ,* Ex. 2). The FDIC determined that, in the event of a bank failure prior to maturity date, the Retirement CD would be insured to the extent of principal and accrued interest to the date of the failure. (*Id.* at 3). If a failure occurred after maturity date, the FDIC would pay the customer the balance of the account at maturity date—principal plus accrued interest—minus the sum of any withdrawal and monthly payments already made. (*Id.* at 3–4). Under no circumstances, however, would the FDIC insure the bank's commitment to make lifetime, monthly payments because the value of such payments was uncertain and could exceed the total account balance. (*Id.* at 4). This portion of the Retirement CD, according to FDIC interpretation, did not fit into the definition of deposit under the FDI Act because the expected value of the contractually agreed-to monthly payments did not reflect an account balance based on deposited principal plus accrued interest. (*Id.* at 4).

Schacht has submitted the opinions of two experts in the Illinois Department of Insurance regarding the nature of the Retirement CD: that of Arnold Dutcher, the Deputy Director of the Regulatory Division; and that of Larry Gorski, the department's Life Actuary. (*Defendant's Memorandum of Law in Support of Motion ("Def. Mem."),* Exs. A; B). Mr. Dutcher felt that the Re-

tirement CD was a fixed annuity life insurance contract similar to those products the state regulates as insurance. (*Id.,* Ex. A at ¶ 5). His opinion was based on the Retirement CD's promise of a monthly payment contingent on the customer's continued life, which gave the Retirement CD a mortality risk. (*Id.* at ¶ 7). The mortality risk means that the Retirement CD is not merely based on economic investment factors, according to Mr. Dutcher, but on the life at risk continuing beyond the expected term. (*Id.,* Ex. A at ¶ 8). Mr. Dutcher stated that dealing with this type of risk is the essence of the insurance underwriting industry. (*Id.,* Ex. A at ¶ 9). Mr. Dutcher also stated that the Insurance Code was designed to regulate underwriters and protect insureds in various specialized ways in view of these mortality risks. (*Id.,* Ex. A at ¶ 10).

Mr. Gorski basically agreed with Mr. Dutcher's assessment of the Retirement CD as an insurance product. (*Id.,* Ex. B). Because of the mortality risk inherent in such products, Mr. Gorski explained that state regulations such as the Insurance Code have built-in, conservative features with respect to the necessary reserve amounts for underwriting. (*Id.,* Ex. B at ¶¶ 12–13). These specialized regulations also touch on minimum capital and surplus amounts. (*Id.,* Ex. B at ¶ 15). Overall, then, the Insurance Code is designed to protect policyholders or annuitants given the specialized risks inherent in insurance or annuity products. (*Id.,* Ex. B at ¶¶ 18–19).

## II. ANALYSIS

### A. Abstention

Before returning to the Retirement CD itself, we must address Schacht's contentions that the federal court should abstain in this matter under two doctrines drawn from Supreme Court opinions: *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); and *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). In addressing these contentions we note, first, that "only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." *New Orleans Public Service, Inc. v. Council of City of New*

*Orleans ("NOPSI")*, 491 U.S. 350, 368, 109 S.Ct. 2506, 2518, 105 L.Ed.2d 298 (1989). Second, and on the other hand, courts have long recognized a few well-defined classes of cases that fall outside the norm where abstention is not only permissible but expected. *Younger*, 401 U.S. at 43–44, 91 S.Ct. at 750.

### 1. *Younger* Abstention

In *Younger*, the Supreme Court held that absent extraordinary circumstances, federal courts must abstain from enjoining ongoing state criminal proceedings. *Id.* at 41, 91 S.Ct. at 750. At the core of any justification for abstention the Court noted, are the notions of comity and federalism:

> The concept does not mean blind deference to "States' Rights" any more than it means centralization of control over every important issue in our National Government and its courts. . . . What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Government, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

*Id.* at 44, 91 S.Ct. at 750. Although *Younger* involved a suit to enjoin a state criminal proceeding, the doctrine has since been expanded beyond state criminal prosecutions to civil proceedings in state court implicating important state interests, *NOPSI*, 491 U.S. at 367–68, 109 S.Ct. at 2517–18 (*citing Huffman v. Pursue Ltd.*, 420 U.S. 592, 604, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482 (1975); *Moore v. Sims*, 442 U.S. 415, 423, 99 S.Ct. 2371, 2377, 60 L.Ed.2d 994 (1979)), and to certain state administrative proceedings that are judicial in nature. *See Middlesex County Ethics Comm. v. Garden State Bar Assoc.*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (lawyer disciplinary proceeding initiated by state ethics committee); *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (barring injunction against an ongoing sex discrimination proceeding before state civil rights commission). Through these and other decisions, a three-part test

has evolved for determining whether *Younger* abstention is appropriate in a given situation:

> (1) the judicial or judicial in nature state proceedings must be on-going;
>
> (2) the proceedings must implicate important state interests; and
>
> (3) there must be an adequate opportunity in the state court proceeding to raise constitutional challenges.

*Middlesex County*, 457 U.S. at 432, 102 S.Ct. at 2521; *Trust & Inv. Advisers, Inc. v. Hogsett*, 43 F.3d 290, 295 (7th Cir.1994). We address each part of this test in turn.

Schacht submits that the proceeding at issue herein—the Department of Insurance's administrative hearing—is judicial in nature. It is governed by the Illinois Administrative Code, which provides that it shall be quasi-judicial, with the hearing officer conducting examination of witness, requiring production of evidence and ruling on admissibility. Witnesses are subject to cross-examination. The proceeding itself consists of the disposition of any preliminary motions, the presentation of the parties' opening statements, the presentation of the parties' cases-in-chief, opportunity for rebuttal, and closing statements. Plaintiffs do not really contest the nature of the proceedings, other than to argue that substance, rather than form, is the controlling factor in such a determination, citing *NOPSI*. (*Plaintiff's Memorandum in Opposition ("Pl.Opp.")* at 22). In *NOPSI*, however, the Court found that the ratemaking challenged therein, which established a rule for the future, was not judicial in nature but legislative. 491 U.S. at 371, 109 S.Ct. at 2520. Here, defendants cannot, and do not, seriously argue that the challenged proceeding is one in which there is the making of a new rule for the future and is therefore legislative. Clearly, the administrative proceeding is aimed at determining the applicability of the Insurance Code to the Retirement CD.

 Next, Schacht contends that important state interests are involved. Clearly, the regulation of the insurance industry is an important state interest. *See supra* at 1069. Plaintiffs do not dispute this, but focus their

attention on the remaining part of the test, the competency of the state forum to address their constitutional concerns.[6] A fundamental assumption underlying the *Younger* abstention doctrine is the availability of a competent state forum. *Withrow v. Larkin,* 421 U.S. 35, 44 n. 8, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); *Gibson v. Berryhill,* 411 U.S. 564, 577, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973). When the state tribunal is deemed to be biased or to have otherwise prejudged the controversy, abstention in deference to the state proceeding under *Younger* is inappropriate. *Hogsett,* 43 F.3d 290, 295 (7th Cir. 1994). Here, Schacht, the Director of the Illinois Department of Insurance has already determined that the Retirement CD is an annuity and is therefore subject to regulation under the Insurance Code. He has in no way represented in these proceedings that he has not yet reached this conclusion, or that he will only reach it upon the conclusion of the challenged administrative proceedings. His position herein has not been merely that he is of a high degree of expertise in examining the Retirement CD and determining its character; he has, instead, steadfastly maintained that the Retirement CD is an annuity subject to insurance regulation. In this regard, we find that Schacht has prejudged the integral element of this case—such is clear from his submissions on this issue in this court. Accordingly, we find *Younger* abstention inappropriate in this matter.

### 2. *Burford* Abstention

◼ Schacht next argues that *Burford* abstention requires dismissal of this action. *Burford* abstention is concerned with the protection of complex state administrative processes from undue federal interference. *NOPSI,* 491 U.S. at 362, 109 S.Ct. at 2515. It does not, however, require abstention whenever such a process exists, or whenever there is a potential for conflict. *Id.* The heart of the dispute herein is not whether the state is misapplying its lawful authority or has failed to adequately consider relevant state-law factors—abstention might be appropriate under such circumstances. *Id.* Instead, the issue here is whether the nature of the Retirement CD even brings it under the auspices of state law or regulatory authority. As noted above, the state has already assumed that it does. We, however, are not prepared to take that leap of faith before examining the Retirement CD. Once again, given the posture of this case, abstention would be inappropriate.

### B. *The Nature of the Retirement CD*

The power to name a thing has often been associated, in theology and philosophy, with the power to exercise dominion over that thing. In the Book of Genesis, whatever Adam chose to name the creatures God paraded before him, that was what they were. *Genesis* 2:19. The power to name is, at times, assumed to denote a superior understanding of the nature of the thing named, perhaps because the ability to name can be a prerequisite to that understanding. In this case, the parties toss about various names to denote their understanding of the Retirement CD: deposit, investment, annuity, insurance. In so doing, each side is able to bring the Retirement CD within its auspices. As the plaintiffs would have it, if the OCC determines that the Retirement CD is a deposit—and it did—then it is a deposit and is a power of banking that cannot be subject to state regulation. If it is an annuity—and both sides appear to concede that it is—then, according to Schacht, it is subject to state regulation because the Insurance Code says that the Insurance Code applies to annuities. Simple enough, until one questions the nature of a deposit, the nature of an annuity, the nature of the Retirement CD itself. Then, the parties' positions bring to mind a passage from Lewis Carroll:

> "When *I* use a word," Humpty Dumpty said in a rather scornful tone, "it means just what I choose it to mean, neither more nor less."

---

6. At times, the absence of a competent state tribunal is considered under the third part of the test. *Hogsett,* 43 F.3d at 295 n. 6. It has also been described as one of the "extraordinary circumstances alluded to in *Younger* where abstention is inappropriate even though all of the *Younger* elements have been met." *Id., quoting Kugler v. Helfant,* 421 U.S. 117, 124–25 n. 4, 95 S.Ct. 1524, 1530–31 n. 4, 44 L.Ed.2d 15 (1975). We consider it within the third part of the test here.

"The question is," said Alice, "whether you can make words mean so many different things."

"The question is," said Humpty Dumpty, "which is to be the master—that's all." Lewis Carroll, Through the Looking–Glass, ch. 6 (1872). Here, rather than choose a word to mean "Retirement CD," we look to nature of the product to determine whether or not that nature makes it an appropriate subject for regulation under the Insurance Code.

### 1. Retirement CD as Deposit

We begin with an analysis of the plaintiffs' position: that the Retirement CD is merely a "deposit" which removes it from the regulatory realm of the state of Illinois. The plaintiffs assert that their position is based on the definition of a "deposit" in the ordinary sense of the term, and the definitions applied by the two pertinent federal regulatory authorities: the OCC and the FDIC. From an ordinary sense standpoint, plaintiffs cite Black's Law Dictionary for the proposition that a "deposit" refers to any money " 'plac[ed] in the custody of a bank or banker, for safety or convenience, to be withdrawn at the will of the depositor or under such rules and regulations agreed upon.' " (*Pl.Mem.* at 5; *Plaintiffs' Reply Memorandum ("Pl.Reply")* at 2; *quoting* Black's Law Dictionary 438 (6th ed. 1990)). Plaintiffs go on to explain that:

> [a] bank deposit thus encompasses any transaction where a customer (1) places his money in a bank's hands under (2) an agreement establishing terms for its return. An agreement as to when and how a depositor's money will be withdrawn, then, is an integral feature of every bank deposit agreement. Any number of withdrawal agreements between the depositor are feasible (subject, of course, to comprehensive federal regulation). The agreement may provide for the bank to return the money or some portion thereof to the customer upon demand, as in a traditional checking account; or with payment of interest at a fixed or variable rate on the outstanding balance, as in a NOW account. The agreement may provide for interest to be paid at a fixed rate on the balance with repayment only upon a stated advance notice, as in a traditional savings account; or the agreement may provide for repayment with interest at a fixed date in the future, or with a penalty for early withdrawal, as in a conventional certificate of deposit; or the agreement may provide for interest to be paid at a rate tied to a financial indicator such as stock market performance. That all these different withdrawal mechanisms nonetheless qualify as "deposits" is black-letter law.

(*Pl.Reply* at 2–3 (citations omitted)). Based on these factors—the placement of money with a bank and an agreement establishing terms for the return of the money—plaintiffs argue that the Retirement CD fits easily within the category of "deposits." The problem is, so would a single premium, whole life insurance policy sold by a bank: a placement of funds and a return of those funds upon an event that is agreed upon. We do not suspect, however, that the plaintiffs would argue that single premium, whole life insurance could not be regulated by the states.

None of the agreements establishing terms for return of deposited money cited by plaintiffs involve a return of money over and above principal and accumulated interest; yet, this is the key element of the Retirement CD. The guarantee of a fixed monthly lifetime payment is the selling point of the product, the feature emphasized in promotional materials. (*Pl.MSJ*, Ex. 3). The monthly payment can continue long after the exhaustion of principal and interest. It is this feature that makes the Retirement CD an unwieldy fit into the "deposit" category.

Plaintiffs rely to a great extent on the OCC's "no-objection" letter in which the OCC found the Retirement CD fell within traditional banking powers of receiving deposits, and incurring liabilities and funding its operations. Citing *NationsBank of N.C. v. Variable Annuity Life Ins.,* —— U.S. ——, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995), plaintiffs argue that the OCC's determination that the Retirement CD is a deposit is entitled to controlling weight. (*Pl.Reply* at 5). In *NationsBank,* the OCC approved a national bank's application to broker annuities as an

incidental power necessary to carry on the business of banking. —— U.S. at ——, 115 S.Ct. at 815. The Court stated that the judgment of an administrator—such as the OCC—that defines a term in a way that is reasonable in light of the legislature's revealed design is entitled to controlling weight. *Id.* at ——, 115 S.Ct. at 813–14. After examining the OCC's conclusions in light of the Bank Act, the Court found the OCC's approval to be reasonable. *Id.* at ——, 115 S.Ct. at 815. For three reasons, however, we are not persuaded by the plaintiff's citation to *NationsBank.*

First, it is important to distinguish the activity at issue in *NationsBank* with that at issue here. In *NationsBank,* the Court and the OCC were concerned with a bank's authority to act as a broker for annuities issued by insurance companies, to offer an additional service to its customers. *Id.* at ——, 115 S.Ct. at 812. While banks can act as broker for securities, as an example, they cannot underwrite the issue of securities or stock. 12 U.S.C. § 24 (Seventh) *cited in Nations-Bank,* —— U.S. at ——, 115 S.Ct. at 813. Banks in towns of 5,000 or less in population can also broker, as oppose to underwrite, insurance. 12 U.S.C. § 92. Here, conversely, we are not concerned with a bank's authority to act as a broker for the Retirement CD, we are concerned with the risks attendant to underwriting such a product. Schacht's threatened action against Blackfeet was prompted by his perception that those risks should be subject to state regulation; that is what this case is about. The question of state regulation of insurance did not arise in *NationsBank;* presumably, the insurance companies that actually issued and underwrote the annuities in that case had already been subjected to the type of regulatory framework Schacht seeks to impose here.

Second, the OCC in *NationsBank* issued an *approval letter* in response to the bank's application for same. *Variable Annuity Life Ins. Co. v. Clarke,* 998 F.2d 1295, 1297 (5th Cir.1993); *Variable Annuity Life Ins. Co. v. Clarke,* 786 F.Supp. 639, 640–41 (S.D.Tex. 1991). Here, by comparison, Blackfeet did not seek approval or permission from the OCC to issue the Retirement CD, and the

OCC issued "no-objection" letter as opposed to a formal approval. (*Memorandum of Law of ACLI,* Ex. 8 at 1–2). While the parties do not address this distinction, the OCC's own language, we feel, reduces the weight we need accord the "no-objection" letter herein. The OCC's primary concern regarding the Retirement CD was that the bank mitigate the risk of lifetime payments even in situations where the maturity balance is exhausted, and suggested the bank purchase annuities from insurance companies to fund such an obligation. In its letter to Congressman Dingell, the OCC reserved judgment on whether a bank could underwrite annuities and whether the Bank Act preempted state insurance law, but conceded that state officials might deem the Retirement CD subject to insurance regulation and that Blackfeet would have to comply with all applicable state laws. (*Id.* at 2–4). As we intimated at the outset of this discussion, this case is not so much concerned with the proper anointment of the Retirement CD as deposit or insurance, but with the nature of the product itself. The OCC does not really address these concerns but, indeed, appears to suggest that, deposit or not, the Retirement CD might be within the regulatory ambit of state insurance laws. Accordingly, we do not feel constrained to hold that the product is a deposit and therefore beyond the reach of the Insurance Code on the basis of the OCC's "no-objection" letter.

Third, and finally, even if we were to apply *NationsBank* to the OCC "no-objection" position that the Retirement CD is a "deposit" and determine the deference to be accorded that position, we would have to stop short of giving it controlling weight. We return to the salient feature of the product: the guaranteed, lifetime monthly payment. Noting that there was the possibility that such payments would go on beyond the exhaustion of the maturity balance, the OCC characterized them as "additional interest." We are troubled by this rationale. Interest is ordinarily earned while there is a principal at work— the two go hand and hand—and is definable at a certain rate. Black's Law Dictionary, 812–13 (6th ed. 1990). Neither can be said of the lifetime monthly payments that are the salient feature of the Retirement CD. While

we do not reach a *NationsBank* examination of the OCC's "no-objection" letter, we would be extremely reluctant to accept the attribution of the lifetime, monthly payments after the exhaustion of principal *and* interest as "additional interest." This integral part of the Retirement CD was also cause for concern to the FDIC, upon whose opinion plaintiffs also rely.

The FDIC's opinion regarding the insurability of the Retirement CD lends more comfort to Schacht than to the plaintiffs. Based on the FDI Act's definition of a "deposit," the FDIC limited the insurable amount of the Retirement CD to the principal and interest. "Under no circumstances" would the FDIC insure the banks commitment to make lifetime monthly payments. (*Pl.MSJ*, Ex. 2 at 4). According to the FDIC, such an arrangement was not contemplated by the FDI Act's definition of "deposit." In an effort to reduce the significance of this limitation on FDIC insurance, plaintiffs can only point out that "FDIC insurance on *all* bank deposits is limited to $100,000 dollars, but a deposit of $101,000 or $1,000,000 remains a 'deposit' under federal banking law ..." (*Pl.Reply* at 6). This argument, however, confuses a limitation on the *amount* the FDIC will insure with the *nature* of things it will insure. Suppose a Retirement CD customer has a maturity balance at age 65 of $14,400. He withdraws ⅔—$9,600—leaving a balance of $4,800. Ignoring for the moment the applicable interest rate, and assuming his life expectancy was another ten years—120 months—the bank would, under the terms of the Retirement CD, guarantee him a lifetime monthly payment of $40. Despite the fact that the customer would have to another 188 years before the total return would reach the FDIC's $100,000 insurance limit, there would be no FDIC insurance on any payments beyond the $4,800. There is simply no basis whatsoever to analogize the FDIC's refusal to insure lifetime monthly payments over and above principal and interest with its insurance limit of $100,000 on deposits. The FDIC's refusal to extend insurance to the salient feature of the Retirement CD is not based on an amount of deposit, but on the nature of the product. It is the nature of the product, not whether it can be called a "de-posit" in certain contexts, that is at issue here.

### 2. Retirement CD as Insurance Product

We turn now to consider Schacht's position: that the Retirement CD is an annuity and, therefore, is subject to regulation under the Insurance Code. Schacht's argument, to an extent, is similar to that of the plaintiffs: because the Retirement CD is an annuity and the Insurance Code lists annuities as subject to insurance regulation, the Retirement CD should be subject to insurance regulation. Granted, it would appear that all fifty states regulate annuities under their insurance laws. *See Variable Annuity Life Ins. Co. v. Clarke*, 998 F.2d 1295, 1300 n. 2 (5th Cir.1993) *rev'd on other grounds, NationsBank* (collected state statutes). The association of the term "annuity" with a state's insurance laws is no more dispositive of the issue before us, however, than the reference to the Retirement CD as a deposit already discussed. Instead, it is the nature of the Retirement CD that is at issue here, especially the *risks* inherent in the product. Whether the Retirement CD is called a "deposit," an "annuity," or an "insurance product," the risk involved, correctly identified by Schacht, is a "mortality risk." It is this element of "mortality risk" that, in large part, we believe, renders the Retirement CD an appropriate subject for state insurance regulation.

■ The fundamental characteristic of insurance is the spreading and underwriting of risk; the risk to be insured against is shifted or distributed. *Group Life & Health Ins. v. Royal Drug Co.*, 440 U.S. 205, 211, 99 S.Ct. 1067, 1073, 59 L.Ed.2d 261 (1979); *Barnes v. United States*, 801 F.2d 984, 985 (7th Cir. 1986). In the life insurance context, the Seventh Circuit has explained that:

the insured and the insurer are both betting on the longevity of the insured. The risk to the insurer is that death will come before the value for premiums paid exceeds the death benefit. The insured risks that the value of his or her payments will surpass the promised payment before death. If the contract operates to insure a

risk-free system for either party, it is not a life insurance contract.

*Barnes,* 801 F.2d at 985 (citations omitted). Thus, a longevity or "mortality risk" is a necessary, although perhaps not a sufficient, element of insurance. Insurance also requires, in combination with the mortality risk, a guarantee of a fixed return. *Securities & Exch. Com'n v. Variable Ann. Ins. Co.,* 359 U.S. 65, 71, 79 S.Ct. 618, 622, 3 L.Ed.2d 640 (1959), *cited in Royal Drug,* 440 U.S. at 212, 99 S.Ct. at 1073–74; *Otto v. Variable Annuity Life Ins.,* 814 F.2d 1127, 1131 (7th Cir.1986). In *Securities & Exch.,* the Court considered a mortality risk without the element of a fixed return to be a "superficial" mortality risk. 359 U.S. at 71, 79 S.Ct. at 622. While it is not clear whether mortality risk and guaranteed fixed return are separate elements of insurance, or whether a guaranteed fixed return is essential to a "true" mortality risk, the insurance encompasses both features in some fashion.

▪ An annuity can perhaps best be described as the mirror image of life insurance. *Clarke,* 998 F.2d at 1301. The annuitant and the issuer of the annuity are, again, both betting on the longevity of the annuitant. In the case of an annuity, however, the annuitant risks that death will come before he or she receives annuity payments in the amount he or expended to purchase the annuity. The issuer risks that the annuitant will live so long that the annuity payments will exceed the value of the price received for the annuity. *See, generally, Id.;* and *Associates in Adolescent Psychiatry v. Home Life,* 941 F.2d 561, 565 (7th Cir.1991). Just as in the case of the insurance policy, the fundamental risk of an annuity is a mortality risk.

Like the life insurance context, the presence of a mortality risk is not alone sufficient to render an annuity "insurance" or an "insurance product." An annuity contract that does not guarantee a fixed return does not place a true mortality risk on the issuer, a true insurance underwriting risk. *Securities & Exch.,* 359 U.S. at 71–73, 79 S.Ct. at 622–23; *Otto,* 814 F.2d at 1131. Plaintiffs take this idea a step too far, however, citing *NationsBank* for the proposition that a mortality risk has little or no influence on the nature of

a product. (*Pl.MSJ* at 20; *Pl.Opp.* at 8). In *NationsBank,* the Court's holding was simply that the OCC could reasonably find the selling, as opposed to the underwriting, of annuities was an incidental power of banking. *Id.* at ——, 115 S.Ct. at 815. While the Court also accepted as reasonable the OCC's point that a mortality risk was not a necessary feature of many modern annuities, this point was based on the fact that many such products do not feature a life term—as opposed to the Retirement CD. —— U.S. at ——, 115 S.Ct. at 816. In addition, as we already noted, the *NationsBank* Court was dealing with a national bank brokering, as opposed to underwriting, annuities. Even in the context of a fixed annuity with a life term, then, as between purchaser and bank, only the purchaser would be assuming a mortality risk. *Id.* at ——, 115 S.Ct. at 816. *NationsBank* did not address the notion of a guaranteed, fixed return that, as we have seen, must be coupled with a mortality risk to render an annuity an insurance product. Thus, as we have already intimated earlier in our discussion, the *NationsBank* holding does not address the concerns we have with the case before us. In any event, it is not inconsistent with the notion that an annuity can be called an insurance product when it involves not only a mortality risk to annuitant and issuer, but includes a guaranteed fixed return. *Securities & Exch. Com'n,* 359 U.S. at 71–73, 79 S.Ct. at 622; *Otto,* 814 F.2d at 1131. When the terms of the Retirement CD are examined, it becomes clear that by its nature it is the type of annuity that qualifies as an insurance product in this context.

The Retirement CD customer places a lump sum with Blackfeet in exchange for a lifetime monthly payment. Whether that sum is called a "deposit" or the purchase price of the annuity does not affect the nature of the product. Clearly, there is a traditional, insurance-product mortality risk to both the customer and Blackfeet. The customer hopes to live long enough that the monthly lifetime payments exceed the value of the lump sum or, more specifically, the maturity balance. Blackfeet calculates the amount of the monthly payments based, in substantial part, on the actuarial prediction

of how long the customer will live; it wagers that the customer will not live so long as to exhaust the maturity balance. This gamble is a true insurance risk under *Securities & Exch.:* the lifetime monthly payments are *guaranteed.* Thus, there is a mortality risk to both parties and a guaranteed return. Whether it is called a "deposit," an "annuity," or something else, the nature of the Retirement CD makes it an appropriate subject for regulation as an insurance product because it entails an insurance or mortality risk and a guaranteed return.

Plaintiffs disagree with the characterization of the risk to Blackfeet and its customers as an insurance risk. While they do not retreat from their position that the Retirement CD is a "deposit," they submit that, to the extent it can be considered an "annuity," it involves an "investment risk" as opposed to an "insurance risk." (*Pl.MSJ* at 20; *Pl.Opp.* at 6–8). In fact, plaintiffs contend that annuities and insurance are opposites, citing *Helvering v. Le Gierse,* 312 U.S. 531, 61 S.Ct. 646, 85 L.Ed. 996 (1941) and *Keller v. Commissioner of Internal Revenue,* 312 U.S. 543, 61 S.Ct. 651, 85 L.Ed. 1032 (1941). These companion cases dealt with the tax consequences of two similar, single transactions that combined an annuity and a life insurance policy. *Helvering,* 312 U.S. at 536–37, 61 S.Ct. at 648; *Keller,* 312 U.S. at 543–44, 61 S.Ct. at 652. Neither holding undermines the conclusion that the Retirement CD, by any other name, involves a mortality risk that is a proper focus of state insurance regulation. In *Helvering,* the Court stated that:

> annuity and insurance are opposites; in combination the one neutralizes the risk customarily inherent in the other. From the [issuing] company's viewpoint, insurance looks to longevity, annuity to transiency.

312 U.S. at 541, 61 S.Ct. at 650.[7] Either risk—longevity or transiency—is a mortality risk. The annuitant gambles that he or she will live long enough that annuity payments will exceed the price of the annuity; the company issuing the annuity takes the opposite position. In the context of a life insurance policy, the positions are reversed, with the issuing company hoping the policyholder will live long enough that the earnings on the premiums he or she pays will eclipse the amount of the agree upon death benefit. The element of risk, in either case, is the same. Thus, in both *Helvering* and *Keller,* the Court found that the issuance of annuity and insurance policy in combination "countervailed a risk otherwise assumed in [the issuance of an] 'insurance' policy." *Keller,* 312 U.S. at 545, 61 S.Ct. at 652. Neither case undermines the conclusion that the Retirement CD is an appropriate subject for regulation as an insurance product.

### C. *The Bank Act and the Insurance Code*

Having determined the Retirement CD meets the definition of an insurance product that is an appropriate subject for regulation, we need only briefly consider two additional points: federal preemption and the McCarran–Ferguson Act. The plaintiffs argue that the Bank Act preempts the Insurance Code insofar as the state regulation of a national bank is inconsistent with, or conflicts with, federal law. According to Schacht, however, there is no real conflict between state and federal law here. To the extent that there may be, Schacht contends that state regulation of the Retirement CD is saved from preemption by the McCarran–Ferguson Act.

### 1. Preemption

The Supremacy Clause of Article VI of the Constitution provides Congress with the power to preempt state law. Preemption occurs when Congress, in enacting a federal statute, expresses a clear intent to preempt state law; when there is outright or actual conflict between federal and state law;

---

7. Plaintiffs mistakenly cite *Helvering* for the proposition that an "annuity involves 'investment risk similar to the risk assumed by a bank ... not an insurance risk.'" (*Pl.MSJ* at 20). In fact the court held that, for tax purposes, the risk assumed by the company issuing the combination annuity-life insurance policy was similar to a mere investment risk, as opposed to an insurance risk. *Helvering,* 312 U.S. at 542, 61 S.Ct. at 650. The issuance of the two items—annuity and insurance policy—in a single transaction neutralized the "mortality risks" that ordinarily accompany the issuing of either item separately. *Id.* at 541, 61 S.Ct. at 650.

where compliance with both federal and state law is in effect physically impossible; where there is implicit in federal law a barrier to state regulation; where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law; or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. *Louisiana Public Service Com'n v. F.C.C.*, 476 U.S. 355, 360–61, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). Preemption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may preempt state regulation. *Id.* at 369, 106 S.Ct. at 1898–99. Here, the plaintiffs submit that the Bank Act—specifically 12 U.S.C. § 24 (Seventh)—preempts the Insurance Code, essentially by authorizing banks to receive deposits. We cannot agree with the plaintiffs' line of reasoning.

■ The portion of the Bank Act authorizing national banks to receive deposits has nothing to do with a bank's power to underwrite annuities or insurance risks. Quite simply, there is no conflict between the Bank Act and the Insurance Code's regulation of insurance products in this context; the issue of the Bank Act's preemption of the Insurance Code in this case is illusionary. The only real conflict in this case is between the Insurance Code and the OCC's "no-objection" letter finding the Retirement CD could be considered a "deposit" under the Bank Act. As we stated above, a federal agency acting within its delegated authority can preempt state regulation, but that is not what the OCC did here. In order to preempt state authority, the OCC must establish rules with the force of law, such as a regulation adopted after notice and comment rulemaking. *Wabash Valley Power v. Rural Electrification Admin.*, 903 F.2d 445, 453–54 (7th Cir.1990) (*citing Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S.

141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982)). The OCC's "no-objection" letter to Blackfeet simply cannot be accorded preemptive effect.[8] *Wabash Valley*, 903 F.2d at 453–54. Thus, the Bank Act, or more accurately for the purposes of this case, the OCC's "no-objection" letter does not preempt the state of Illinois' regulatory authority over the Retirement CD.

### 2. McCarran–Ferguson Act

■ Even if § 24 of the Bank Act or the "no-objection" letter could be considered to preempt the Insurance Code in terms of regulation of the Retirement CD, the Insurance Code would be "immunized" by the McCarran–Ferguson Act. The relevant portion of the McCarran–Ferguson Act Provides:

> (b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance ...

15 U.S.C. § 1012(b). Thus, the Insurance Code is not preempted by § 24 if the Insurance Code was "enacted ... for the purpose of regulating the business of insurance" and § 24 does not "specifically relate[ ] to the business of insurance."

We first consider whether the Insurance Code and, specifically, those licensing and certification regulations at issue here, were enacted for the purpose of regulating the business of insurance. In *Union Labor Life Insurance Co. v. Pireno*, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982), the Supreme Court defined the business of insurance as being made up of practices and activities that satisfy the following criteria:

> *first,* whether the practice has the effect of spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer

---

8. This is not an instance where we have occasion to consider an OCC ruling as to the preemptive effect of the Bank Act. *See, e.g. Idaho Dept. of Finance v. Security Pacific Bank,* 800 F.Supp. 922 (D.Idaho 1992). In fact, the OCC's position on preemption in this matter has been at best

elusive: the OCC has conceded that state regulatory officials could conclude that insurance laws applied to the Retirement CD and that Blackfeet would be required to comply with all applicable state laws and regulations. *Supra* at 1071–1072.

and the insured; and *third*, whether the practice is limited to entities within the insurance industry.

458 U.S. at 129, 102 S.Ct. at 3009. The issue here, then, is whether the Insurance Code was enacted with the "end, intention, or aim" to regulate these types of practices and activities. *U.S. Dept. of Treasury v. Fabe,* — U.S. —, —, 113 S.Ct. 2202, 2210, 124 L.Ed.2d 449 (1993). Clearly, the Insurance Code and its licensing and certification provision were enacted with just such an "end, intention, or aim." [9]

The Insurance Code is a comprehensive regulatory scheme that provides for analysis of financial statements of licensed companies, periodic financial and market conduct examinations of insurance companies, examination and licensing of insurance producers, review and approval of policy forms, regulation and adjustment of rates, and investigation of consumer complaints. (*Def.Mem.,* Ex. A at ¶ 10; *Defendant's Memorandum In Opposition,* Ex. A). The licensing and certification provisions at issue herein are necessary to allow the Department of Insurance to enforce the Insurance Code. The Department cannot regulate the activities of unlicensed entities except to put a halt to those activities. (*Def.Mem.,* Ex. A at ¶ 11). These regulations are designed to protect the consumer in risk-spreading situations and govern the relationship between the consumer as policyholder and the issuing company, and apply to entities conducting business in the insurance industry. In short, the focus of the Insurance Code and its licensing provisions is the protection of insurance consumers, the regulation and enforcement of the relationship between consumers and insurance companies, and the oversight of that relationship's reliability: these, too, are the focus of the McCarran–Ferguson Act. *Fabe,* — U.S. at —, 113 S.Ct. at 2208 (*citing SEC v. National Securities, Inc.,* 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969)).

It remains to be seen whether the Bank Act—especially § 24—specifically relates to the business of insurance. This section, which enumerates banking powers, makes no mention of insurance or the insurance industry. It does not touch on risk-spreading or the relationship between policyholder and insurance company, nor is it aimed at practices that are exclusively within the insurance industry. It is rather obvious that it does not specifically relate to the business of insurance. Plaintiffs do not seriously contend otherwise but do submit that, to the extent the Retirement CD can be considered an insurance product, the Bank Act's authorization of the Retirement CD specifically relates to the business of insurance. (*Pl.MSJ* at 23).

The Bank Act does not "specifically" authorize the Retirement CD, of course; the OCC interprets it to do so in a "no-objection" letter. As we noted in the previous discussion, this cannot be accorded preemptive effect. *See supra* at 1080. Furthermore, in the McCarran–Ferguson context, neither the Bank Act nor the OCC's "no-objection" letter "specifically require[ ]" the Insurance Code to yield to the Bank Act. *See Fabe,* — U.S. at —, 113 S.Ct. at 2211. As we discussed earlier, the OCC's position is, in fact, to the contrary. *Supra* at 1071–1072, 32 n. 8. Thus, we can interpret neither the Bank Act nor § 24 to "specifically relate to the business of insurance" under the McCarran–Ferguson Act. [10] Thus, even if the Bank Act or

---

**9.** Rather than focus on the Insurance Code, the parties direct their McCarran–Ferguson analysis to the nature of the Retirement CD in the effort, we assume, to determine whether the specific regulation of this specific product fits within the McCarran–Ferguson preemption immunization. While we find that the statute as is should be the focus of a McCarran–Ferguson analysis, it is clear from our earlier discussion that the nature of the Retirement CD makes it an appropriate subject for insurance regulation.

**10.** Indeed, the fact that § 24, enacted as part of the original Bank Act in 1864, was in existence at the time the McCarran–Ferguson Act became

law is strong evidence that § 24 cannot be construed as relating to the business of insurance. The McCarran–Ferguson Act's co-sponsor, Senator Ferguson, explained the intent behind 15 U.S.C. § 1012(b) as follows:

What we have in mind is that the insurance business, being interstate commerce, if we merely enact a law relating in some way to interstate commerce, it would not apply to insurance. We wanted to make sure that the Congress, in its wisdom, would act *specifically with reference to insurance* in enacting the law.

Later in the same discussion, it was confirmed that:

the OCC "no-objection" letter could be considered to preempt the Insurance Code, the Insurance Code would be immunized from preemption by the McCarran–Ferguson Act.

## III. *CONCLUSION*

The Retirement CD is, as plaintiffs taut, an "innovative" product, a "new and unique" concept, the only one of its kind—at least as far as banking is concerned. Its innovations fit rather easily into the concept of insurance. Be that as it may, because of its special features, it entails special risks; risks that make it an appropriate subject for insurance regulation. For our purposes, the names that the parties can apply to the Retirement CD are not of as much consequence as the appropriate protection of potential customers. As Berowne lectured in Love's Labor's Lost:

> These earthly godfathers of heaven's lights
> That give a name to every fixed star,
> Have no more profit of their shining nights
> Than those that walk and wot not what they are.

William Shakespeare, Love's Labor's Lost, act I, sc. i, *l.* 84. Better to anger earthly godfathers herein and assure the appropriate regulations will protect those who have no special ken in the matters of "deposits," or "annuities" or "insurance." Accordingly, we must find that the Retirement CD is an appropriate subject for regulation under the Illinois Insurance Code and that the National Bank Act does not direct otherwise.

For the foregoing reasons, it is hereby ordered that the defendant's motion for summary judgment is GRANTED, that the plaintiffs' motion for summary judgment is DENIED, and that the plaintiffs' cause of action is dismissed.

---

*no existing law* and no future law should, by *mere implication, be applied to the business of insurance.*

91 Cong.Rec. 1487 (1945), *cited in Fabe,* —— U.S. at —— n. 7, 113 S.Ct. at 2211 n. 7 (emphasis added).