## NATIONSBANK OF NORTH CAROLINA, N. A., ET AL. *v.* VARIABLE ANNUITY LIFE INSURANCE CO. ET AL.

No. 93–1612.   Argued December 7, 1994—Decided January 18, 1995*

*Together with No. 93–1613, *Ludwig, Comptroller of the Currency, et al.* v. *Variable Annuity Life Insurance Co. et al.,* also on certiorari to the same court.

252

GINSBURG, J., delivered the opinion for a unanimous Court.

*Edward C. DuMont* argued the cause for petitioners in No. 93–1613. With him on the briefs were *Solicitor General Days, Assistant Attorney General Hunger, Deputy Solicitor General Bender, Mark B. Stern, Jacob M. Lewis, Julie L. Williams, L. Robert Griffin,* and *Yvonne D. McIntire. Steven S. Rosenthal* argued the cause for petitioners in No. 93–1612. With him on the briefs were *Robert M. Kurucza* and *Robert G. Ballen.*

*David Overlock Stewart* argued the cause for respondent in both cases. With him on the brief were *Alan G. Priest, Raymond C. Ortman, Jr.,* and *William A. Wilson.*†

---

†Briefs of *amici curiae* urging reversal were filed for the American Bankers Association et al. by *John J. Gill III, Michael F. Crotty, James T. McIntyre, Richard M. Whiting,* and *David L. Glass;* for the Conference of State Bank Supervisors et al. by *David W. Roderer, Eric L. Hirschhorn, Donn C. Meindertsma, J. Thomas Cardwell, Leonard J. Rubin,* and *M. Brooks Senn;* and for the New York Clearing House Association by *John L. Warden, Michael M. Wiseman, Theodore Edelman,* and *Norman R. Nelson.*

Briefs of *amici curiae* urging affirmance were filed for Tom Gallagher, Treasurer and Insurance Commissioner of Florida, et al. by *David J. Busch, Richard Blumenthal,* Attorney General of Connecticut, *pro se,* and *Mark F. Kohler,* Assistant Attorney General, *J. Joseph Curran, Jr.,* Attorney General of Maryland, *Gary L. Spaeth, Heidi Heitkamp,* Attorney General of North Dakota, *Jeffrey B. Pine,* Attorney General of Rhode Island, and *Maureen G. Glynn,* Special Assistant Attorney General; for the American Academy of Actuaries by *Lauren M. Bloom;* for the American Council of Life Insurance by *Gary E. Hughes, Allen R. Caskie,* and *Phillip E. Stano;* for the American Land Title Association by *Sheldon E. Hochberg;* for the National Association of Insurance Commissioners by *Susan E. Martin* and *Ellen Dollase Wilcox;* and for the National Association of Life Underwriters et al. by *Ann M. Kappler* and *Scott A. Sinder.*

JUSTICE GINSBURG delivered the opinion of the Court.

These consolidated cases present the question whether national banks may serve as agents in the sale of annuities. The Comptroller of the Currency, charged by Congress with superintendence of national banks, determined that federal law permits such annuity sales as a service to bank customers. Specifically, the Comptroller considered the sales at issue "incidental" to "the business of banking" under the National Bank Act, Rev. Stat. § 5136, as amended, 12 U. S. C. § 24 Seventh (1988 ed. and Supp. V). The Comptroller further concluded that annuities are not "insurance" within the meaning of § 92; that provision, by expressly authorizing banks in towns of no more than 5,000 people to sell insurance, arguably implies that banks in larger towns may not sell insurance. The United States District Court for the Southern District of Texas upheld the Comptroller's conclusions as a permissible reading of the National Bank Act, but the United States Court of Appeals for the Fifth Circuit reversed. We are satisfied that the Comptroller's construction of the Act is reasonable and therefore warrants judicial deference. Accordingly, we reverse the judgment of the Court of Appeals.

I

Petitioner NationsBank of North Carolina, N. A., a national bank based in Charlotte, and its brokerage subsidiary sought permission from the Comptroller of the Currency, pursuant to 12 CFR § 5.34 (1994), for the brokerage subsidiary to act as an agent in the sale of annuities. Annuities are contracts under which the purchaser makes one or more premium payments to the issuer in exchange for a series of payments, which continue either for a fixed period or for the life of the purchaser or a designated beneficiary. When a purchaser invests in a "variable" annuity, the purchaser's money is invested in a designated way and payments to the purchaser vary with investment performance. In a classic "fixed" annuity, in contrast, payments do not vary. Under

the contracts NationsBank proposed to sell, purchasers could direct their payments to a variable, fixed, or hybrid account, and would be allowed periodically to modify their choice. The issuers would be various insurance companies. See Letter from J. Michael Shepherd, Senior Deputy Comptroller, to Robert M. Kurucza (Mar. 21, 1990), App. to Pet. for Cert. in No. 93–1612, pp. 35a–36a (Comptroller's Letter).

The Comptroller granted NationsBank's application. He concluded that national banks have authority to broker annuities within "the business of banking" under 12 U. S. C. § 24 Seventh. He further concluded that § 92, addressing insurance sales by banks in towns with no more than 5,000 people, did not impede his approval; for purposes of that provision, the Comptroller explained, annuities do not rank as "insurance." See Comptroller's Letter 41a–47a.

Respondent Variable Annuity Life Insurance Co. (VALIC), which sells annuities, challenged the Comptroller's decision. VALIC filed suit in the United States District Court for the Southern District of Texas seeking declaratory and injunctive relief pursuant to the Administrative Procedure Act, 5 U. S. C. § 706(2)(A), and 28 U. S. C. §§ 2201, 2202 (1988 ed. and Supp. V). The District Court granted summary judgment in favor of the Comptroller and NationsBank. *Variable Annuity Life Ins. Co.* v. *Clarke,* 786 F. Supp. 639 (1991). The United States Court of Appeals for the Fifth Circuit reversed. *Variable Annuity Life Ins. Co.* v. *Clarke,* 998 F. 2d 1295 (1993). Relying on its decision in *Saxon* v. *Georgia Assn. of Independent Ins. Agents, Inc.,* 399 F. 2d 1010 (1968), the Fifth Circuit first held that § 92 bars banks not located in small towns from selling insurance, and then rejected the Comptroller's view that annuities are not insurance for purposes of § 92. See 998 F. 2d, at 1298–1302.

Four judges dissented from the failure of the court to grant rehearing en banc. The dissenters maintained that the panel had not accorded due deference to the Comptroller's reasonable statutory interpretations. *Variable Annu-*

*ity Life Ins. Co.* v. *Clark[e]*, 13 F. 3d 833, 837–838 (CA5 1994).[1] We granted certiorari. 511 U. S. 1141 (1994).

## II

### A

Authorizing national banks to "carry on the business of banking," the National Bank Act provides that such banks shall have power—

> "To exercise . . . all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes . . . . The business of dealing in securities and stock by the [bank] shall be limited to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for its own account, and the [bank] shall not underwrite any issue of securities or stock . . . ." 12 U. S. C. § 24 Seventh (1988 ed. and Supp. V).

As the administrator charged with supervision of the National Bank Act, see §§ 1, 26–27, 481, the Comptroller bears primary responsibility for surveillance of "the business of banking" authorized by § 24 Seventh. We have reiterated:

> " 'It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute. The Comptroller of the Currency is charged with the enforcement of banking laws to an extent that warrants the invocation of this principle with

---

[1] The dissenters also observed that 6 of the court's 13 active judges were disqualified from participating in the case. 13 F. 3d, at 834.

respect to his deliberative conclusions as to the meaning of these laws.'" *Clarke* v. *Securities Industry Assn.*, 479 U. S. 388, 403–404 (1987) (quoting *Investment Company Institute* v. *Camp*, 401 U. S. 617, 626–627 (1971)).

Under the formulation now familiar, when we confront an expert administrator's statutory exposition, we inquire first whether "the intent of Congress is clear" as to "the precise question at issue." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842 (1984). If so, "that is the end of the matter." *Ibid.* But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*, at 843. If the administrator's reading fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, we give the administrator's judgment "controlling weight." *Id.*, at 844.

In authorizing NationsBank to broker annuities, the Comptroller invokes the power of banks to "broker a wide variety of financial investment instruments," Comptroller's Letter 38a, which the Comptroller considers "part of [banks'] traditional role as financial intermediaries," *ibid.*, and therefore an "incidental powe[r] . . . necessary to carry on the business of banking." 12 U. S. C. §24 Seventh; see also Interpretive Letter No. 494 (Dec. 20, 1989) (discussing features of financial investment instruments brokerage that bring this activity within the "business of banking") (cited in Comptroller's Letter 38a). The Comptroller construes the §24 Seventh authorization of "incidental powers . . . necessary to carry on the business of banking" as an independent grant of authority; he reads the specific powers set forth thereafter as exemplary, not exclusive.

VALIC argues that the Comptroller's interpretation is contrary to the clear intent of Congress because the banking power on which the Comptroller relies—"broker[ing] financial investment instruments"—is not specified in §24 Sev-

enth. Brief for Respondent 35–45. According to VALIC, the five specific activities listed in § 24 Seventh after the words "business of banking" are exclusive—banks are confined to these five activities and to endeavors incidental thereto. *Id.*, at 35–36. VALIC thus attributes no independent significance to the words "business of banking." We think the Comptroller better comprehends the Act's terms.

The second sentence of § 24 Seventh, in limiting banks' "dealing in securities," presupposes that banks have authority not circumscribed by the five specifically listed activities. Congress' insertion of the limitation decades after the Act's initial adoption makes sense only if banks already *had* authority to deal in securities, authority presumably encompassed within the "business of banking" language which dates from 1863. VALIC argues, however, that the limitation was imposed by the Glass-Steagall Act of 1933, and that the power Glass-Steagall presupposed was specifically granted in the McFadden Act of 1927. Brief for Respondent 46. While the statute's current wording derives from the Glass-Steagall Act, see Act of June 16, 1933, ch. 89, § 16, 48 Stat. 184, the earlier McFadden Act does not bolster VALIC's case, for that Act, too, *limited* an activity already part of the business national banks did. See Act of Feb. 25, 1927, § 2(b), 44 Stat. 1226 (*"Provided,* That the business of buying and selling investment securities shall hereinafter be limited to buying and selling without recourse . . . ."); see also *Clarke* v. *Securities Industry Assn.*, 479 U. S., at 407–408 (even before the McFadden Act, banks conducted securities transactions on a widespread basis); 2 F. Redlich, The Molding of American Banking: Men and Ideas, pt. 2, pp. 389–393 (1951) (describing securities activities of prominent early national banks).[2]

---

[2] We expressly hold that the "business of banking" is not limited to the enumerated powers in § 24 Seventh and that the Comptroller therefore has discretion to authorize activities beyond those specifically enume-

## B

As we have just explained, the Comptroller determined, in accord with the legislature's intent, that "the business of banking" described in §24 Seventh covers brokerage of financial investment instruments, and is not confined to the examples specifically enumerated. He then reasonably concluded that the authority to sell annuities qualifies as part of, or incidental to, the business of banking. National banks, the Comptroller observed, are authorized to serve as agents for their customers in the purchase and sale of various financial investment instruments, Comptroller's Letter 38a,[3] and annuities are widely recognized as just such investment products. See D. Shapiro & T. Streiff, Annuities 7 (1992) (in contrast to life insurance, "[a]nnuities . . . are primarily investment products"); 1 J. Appleman & J. Appleman, Insurance Law and Practice §84, p. 295 (1981) ("Annuity contracts must . . . be recognized as investments rather than as insurance.").

By making an initial payment in exchange for a future income stream, the customer is deferring consumption, setting aside money for retirement, future expenses, or a rainy day. For her, an annuity is like putting money in a bank account, a debt instrument, or a mutual fund. Offering bank accounts and acting as agent in the sale of debt instruments and mutual funds are familiar parts of the business of banking. See, *e. g., Securities Industry Assn.* v. *Board of Governors, FRS,* 468 U. S. 207, 215 (1984) ("Banks long have arranged the purchase and sale of securities as an accommodation to their customers."); *First Nat. Bank of Hartford* v. *Hartford,* 273 U. S. 548, 559–560 (1927) (banks have authority

---

rated. The exercise of the Comptroller's discretion, however, must be kept within reasonable bounds. Ventures distant from dealing in financial investment instruments—for example, operating a general travel agency—may exceed those bounds.

[3] The Comptroller referred to Interpretive Letter No. 494 (Dec. 20, 1989) (approving brokerage of agricultural, oil, and metals futures).

to sell mortgages and other debt instruments they have originated or acquired by discount).

In sum, modern annuities, though more sophisticated than the standard savings bank deposits of old, answer essentially the same need. By providing customers with the opportunity to invest in one or more annuity options, banks are essentially offering financial investment instruments of the kind congressional authorization permits them to broker. Hence, the Comptroller reasonably typed the permission NationsBank sought as an "incidental powe[r] . . . necessary to carry on the business of banking."[4]

## III

### A

In the alternative, VALIC argues that 12 U. S. C. § 92 (1988 ed., Supp. V) bars NationsBank from selling annuities as agent. That section provides:

> "In addition to the powers now vested by law in [national banks] any such [bank] located and doing business in any place the population of which does not exceed five thousand inhabitants . . . may . . . act as the agent for any fire, life, or other insurance company authorized by the authorities of the State in which said bank is located to do business in said State, by soliciting and selling insurance and collecting premiums on policies issued by such company . . . ."

The parties disagree about whether § 92, by negative implication, precludes national banks located in places more populous than 5,000 from selling insurance. We do not reach

---

[4] Assuring that the brokerage in question would not deviate from traditional bank practices, the Comptroller specified that NationsBank "will act only as agent, . . . will not have a principal stake in annuity contracts and therefore will incur no interest rate or actuarial risks." Comptroller's Letter 48a.

this question because we accept the Comptroller's view that, for the purpose at hand, annuities are properly classified as investments, not "insurance."

Again, VALIC contends that the Comptroller's determination is contrary to the plain intent of Congress, or else is unreasonable. In support of its position that annuities are insurance, VALIC notes first that annuities traditionally have been sold by insurance companies. But the sale of a product by an insurance company does not inevitably render the product insurance. For example, insurance companies have long offered loans on the security of life insurance, see 3 Appleman & Appleman, Insurance Law and Practice § 1731, p. 562 (1967), but a loan does not thereby become insurance.

VALIC further asserts that most States have regulated annuities as insurance and that Congress intended to define insurance under § 92 by reference to state law. Treatment of annuities under state law, however, is contextual. States generally classify annuities as insurance when defining the powers of insurance companies and state insurance regulators. See, *e. g.*, 998 F. 2d, at 1300, n. 2 (citing statutes). But in diverse settings, States have resisted lump classification of annuities as insurance. See, *e. g., In re New York State Assn. of Life Underwriters, Inc.* v. *New York State Banking Dept.*, 83 N. Y. 2d 353, 363, 632 N. E. 2d 876, 881 (1994) (rejecting "assertion that annuities are insurance which [state-chartered] banks are not authorized to sell," even though state insurance law "includes 'annuities' in its description of 'kinds of insurance authorized'"); *In re Estate of Rhodes*, 197 Misc. 232, 237, 94 N. Y. S. 2d 406, 411 (Surr. Ct. 1949) (annuity contracts do not qualify for New York estate tax exemption applicable to insurance); *Commonwealth* v. *Metropolitan Life Ins. Co.*, 254 Pa. 510, 513–516, 98 A. 1072, 1073 (1916) (annuities are not insurance for purposes of tax that insurance companies pay on insurance premiums received within

the State); *State ex rel. Equitable Life Assurance Soc. of United States* v. *Ham,* 54 Wyo. 148, 159, 88 P. 2d 484, 488 (1939) (same).

As our decisions underscore, a characterization fitting in certain contexts may be unsuitable in others. See, *e. g., Atlantic Cleaners & Dyers, Inc.* v. *United States,* 286 U. S. 427, 433 (1932) ("meaning [of words] well may vary to meet the purposes of the law"; courts properly give words "the meaning which the legislature intended [they] should have in each instance"); cf. Cook, "Substance" and "Procedure" in the Conflict of Laws, 42 Yale L. J. 333, 337 (1933) ("The tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and should have precisely the same scope in all of them, runs all through legal discussions. It has all the tenacity of original sin and must constantly be guarded against."). Moreover, the federal banking law does not plainly require automatic reference to state law here. The Comptroller has concluded that the federal regime is best served by classifying annuities according to their functional characteristics. Congress has not ruled out that course, see *Chevron,* 467 U. S., at 842; courts, therefore, have no cause to dictate to the Comptroller the state-law constraint VALIC espouses.

VALIC further argues that annuities functionally resemble life insurance because some annuities place mortality risk on the parties. Under a classic fixed annuity, the purchaser pays a sum certain and, in exchange, the issuer makes periodic payments throughout, but not beyond, the life of the purchaser. In pricing such annuities, issuers rely on actuarial assumptions about how long purchasers will live.

While cognizant of this similarity between annuities and insurance, the Comptroller points out that mortality risk is a less salient characteristic of contemporary products. Many annuities currently available, both fixed and variable, do not feature a life term. Instead they provide for payments over a term of years; if the purchaser dies before the term ends,

the balance is paid to the purchaser's estate. Moreover, the presence of mortality risk does not necessarily qualify an investment as "insurance" under § 92. For example, VALIC recognizes that a life interest in real property is not insurance, although it imposes a mortality risk on the purchaser. Tr. of Oral Arg. 42. Some conventional debt instruments similarly impose mortality risk. See Note, Reverse Annuity Mortgages and the Due-on-Sale Clause, 32 Stan. L. Rev. 143, 145–151 (1979).

## B

VALIC also charges the Comptroller with inconsistency. As evidence, VALIC refers to a 1978 letter from a member of the Comptroller's staff describing annuity investments as insurance arrangements. Brief for Respondent 16–17; see Letter from Charles F. Byrd, Assistant Director, Legal Advisory Services Division, Office of the Comptroller of the Currency (June 16, 1978), App. to Brief in Opposition 1a–2a (Byrd Letter). We note, initially, that the proposal disfavored in the 1978 letter did not clearly involve a bank selling annuities as an agent, rather than as a principal. See Byrd Letter 1a ("[T]he bank would purchase a group annuity policy from an insurer and then sell annuity contracts as investments in trust accounts."). Furthermore, unlike the Comptroller's letter to NationsBank here, the 1978 letter does not purport to represent the Comptroller's position. Compare Byrd Letter 1a ("It is my opinion . . . ") with Comptroller's Letter 35a ("The OCC's legal position on this issue was announced in a [prior 1990 letter]. Since I find neither policy nor supervisory reasons to object to this proposal, the Subsidiary may proceed."). Finally, any change in the Comptroller's position might reduce, but would not eliminate, the deference we owe his reasoned determinations. See *Good Samaritan Hospital* v. *Shalala*, 508 U. S. 402, 417 (1993) (quoting *NLRB* v. *Iron Workers*, 434 U. S. 335, 351 (1978)).

The Comptroller's classification of annuities, based on the tax deferral and investment features that distinguish them

from insurance, in short, is at least reasonable. See Comptroller's Letter 44a. A key feature of insurance is that it indemnifies loss. See Black's Law Dictionary 802 (6th ed. 1990) (first definition of insurance is "contract whereby, for a stipulated consideration, one party undertakes to compensate the other for loss on a specified subject by specified perils"). As the Comptroller observes, annuities serve an important investment purpose and are functionally similar to other investments that banks typically sell. See *supra*, at 259–260. And though fixed annuities more closely resemble insurance than do variable annuities, fixed annuities too have significant investment features and are functionally similar to debt instruments. Moreover, mindful that fixed annuities are often packaged with variable annuities, the Comptroller reasonably chose to classify the two together.

*     *     *

We respect as reasonable the Comptroller's conclusion that brokerage of annuities is an "incidental powe[r] . . . necessary to carry on the business of banking." We further defer to the Comptroller's reasonable determination that 12 U. S. C. § 92 is not implicated because annuities are not insurance within the meaning of that section. Accordingly, the judgment of the Court of Appeals for the Fifth Circuit is

*Reversed.*