REVISED FEBRUARY 17, 2003

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 01-51298

_____

WELLS FARGO BANK OF TEXAS NA; BANK OF
AMERICA NA; BANK ONE NA; THE CHASE
MANHATTAN BANK; COMERICA BANK-TEXAS,

Plaintiffs - Appellees,

v.

RANDALL S. JAMES, in his official
capacity as Texas Banking Commissioner,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas

February 5, 2003

Before DAVIS, JONES, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

This banking case presents a preemption question.  The

Texas Legislature enacted a par value statute, Tex. Bus. & Com. Code

§ 4.112, (hereinafter "Par Value") which prohibits banks in Texas,

including national banks,  from charging a fee for cashing a check

that is presented to be drawn against an account that the bank

itself holds.   Plaintiff-appellees Wells Fargo Bank of Texas, *et*

*al.* (the "Banks") are national banks that do business in Texas.[1] The Banks contend that Par Value is preempted by the National Bank Act, 12 U.S.C. § 21 *et seq.,* and by 12 C.F.R. §7.4002(a). On cross motions for summary judgment, the district court found that Par Value is preempted, granted summary judgment in favor of the Banks, permanently enjoined Defendant-appellant James, in his capacity as Texas Banking Commissioner (hereinafter Texas or Appellant), from enforcing Par Value, and decreed Par Value null and void. Appellant appeals from this ruling.

I.

Texas enacted Par Value which provides that, " a payor bank shall pay a check drawn on it against an account with a sufficient balance at par, without regard to whether the payee holds an account at the bank." Texas BCC §4.112(a). The legislation prohibits banks from charging a fee to non-account holding payees who present a check to the bank which holds the account that the check is drawn against. Under Par Value banks are still permitted to charge a fee for cashing a check to the account holder who authored the check. Texas offers two policy considerations in support of Par Value. First, Texas identifies

---

[1] Specifically, Plaintiffs-Appellees Wells Fargo Bank, Bank of America, and Bank One are national banks. Plaintiffs-Appellees Chase Manhattan Bank, Comerica Bank-Texas, and Compass Bank are state-chartered banks which, for the purpose of this appeal, enjoy the same preemption rights as national banks pursuant to the Federal Deposit Insurance Act, 12 U.S.C. § 1831a(j)(1), and the Texas Constitution art.16, § 16(c).

Par Value as a consumer protection measure, enacted to ensure that Texas employees, and in particular the working poor, receive payment for the face value of their paycheck. Texas notes that individuals who do not have a checking account and who seek to cash checks at the institution which issued the negotiable instrument are predominately low-income individuals, and are also disproportionately members of minorities. Texas sought to prohibit banks from exporting the cost of issuing a negotiable instrument to its account holder- a service that is clearly useless unless the instrument is redeemable - to non-account holding payees with whom the bank has no financial relationship. Additionally, Texas sought to protect the integrity of negotiable instruments in Texas, concluding that if a check is subject to a redemption fee, the value of the check itself differs from its face value. Par Value was scheduled to go into effect September 1, 2001.

Appellee Banks are organized under the National Bank Act (NBA), 12 U.S.C. §21 *et seq.* and they conduct business in Texas. The NBA authorizes federally chartered national banks to, "exercise all such incidental powers to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange and other evidences of debt." 12 U.S.C. §24(Seventh).

The Office of the Comptroller of the Currency (OCC) is the

agency empowered by the NBA to supervise and regulate federally chartered banks in accordance with the broad substantive provisions of the NBA. In an exercise of this authority the OCC promulgated 12 C.F.R. §7.4002(a), which provides that a national bank may, "charge its customers non-interest charges and fees." The OCC interprets the word "customer" in the regulation to include any person who presents a check for payment.[2] In August 2001, the OCC issued identical letters to three of the Appellee Banks opining that the Banks were authorized under 12 C.F.R. §7.004(a) to charge a check-cashing fee to non-account holders. The letter expressly declined to opine as to whether Par Value was preempted by 12 C.F.R. §7.004(a) and the NBA.

On August 17, 2001 Appellees initiated this action under a preemption theory. The Banks sought a permanent injunction and a declaration that Par Value was null and void. On August 31, 2001, the district court entered a preliminary injunction followed by a permanent injunction on December 3, 2001. The district court found Par Value was preempted by the NBA and interpretive rule 12 C.F.R. §7.004(a), declared Par Value null and void. Appellant appeals the district court's determination that Par Value is preempted.

---

[2] The OCC offered this interpretation in interpretative letters directed to three of the Appellee Banks: Wells Fargo, Bank of America, and Bank One, and has continued to offer the interpretation throughout this litigation.

II.

The principal question before this Court is whether the Texas Par Value statute stands in irreconcilable conflict with, and is consequently preempted by, federal law.[3] We conclude that it is.

In assessing whether Par Value is preempted, our paramount concern is to effectuate the intent of Congress. *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280(1987).  Generally we have recognized three ways in which Congress evidences its intent to preempt state law. *Id.* at 280-82. *City of Morgan City v. South Louisiana Elec*. Co-op., 31 F.3d 319, 322 (5th Cir. 1994). Congress may reveal its preemptive intention by enacting express language to that effect, or by occupying the regulatory field, or, as here, by enacting a law which the state legislation irreconcilably conflicts.[4] *Id.*  In this third instance, which is

_____

[3] A conflict between state and federal law may be deemed "irreconcilable" where the state law mandates or places irresistible pressure on the subject of the regulation to violate federal law, *Rice v. Norman Williams Co.,* 458 U.S. 654, 659 - 662 (1982), where compliance with both regulations is physically impossible, *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 204,(1983),where the state regulation frustrates or hectors the overall purpose of the federal scheme, *City of Morgan City v. South Louisiana Elec*. Co-op., 31 F.3d 319, 322 (5th Cir. 1994), or where the federal scheme expressly authorizes an activity which the state scheme disallows. *Barnett Bank of Marion County, v. Nelson*, 517 U.S. 25 (1996).

[4] There is no contention here that Congress has occupied the banking fee regulatory field, or that the NBA expressly provides

5

the situation at hand, the intent to preempt contrary state law is ascribed to Congress, presuming as we do, that Congress intended to supercede those subsequent state regulations that conflict with the letter or frustrate the purpose of the federal regulatory scheme.

In the field of banking regulation, our conflict preemption analysis is further refined by the Supreme Court's holding in *Barnett Bank of Marion County, v. Nelson*, 517 U.S. 25 (1996). In *Barnett Bank*, the Supreme Court found that a Florida law which forbade banks in Florida from selling insurance was preempted by a federal statute that expressly authorized national banks to sell insurance. *Id.* at 31. The *Barnett Bank* Court concluded that a state statute may regulate national banks, "where...doing so does not prevent or significantly interfere with the national bank's exercise of its powers." *Id.* at 31. Thus, where a state statute interferes with a power which national banks are authorized to exercise, the state statute irreconcilably conflicts with the federal statute and is preempted by operation of the Supremacy Clause. U.S. Const., Art. VI, cl. 2; *Barnett Bank,* 517 U.S. 25, 31.

Therefore, in the case at bar, to determine whether Par Value stands in conflict with federal law, we must first

---

that state regulations concerning banking fees shall be preempted. Thus, our analysis here is focused on whether there exists an irreconcilable conflict between the state and federal law.

determine whether federal law authorizes the fee-charging which Par Value prohibits. The Banks assert that Par Value is preempted by the OCC promulgated regulation 12 C.F.R. §7.4002(a).[5] We turn now to consider the preemptive effect of that provision.

Section 7.4002(a) provides that a national bank may "charge its customers non-interest charges and fees, including deposit account service charges." 12 C.F.R. §7.4002(a). While on its face, the regulation would seem not to conflict with Par Value, as Par Value prohibits a fee charged to nonaccount-holding payee, the OCC has interpreted the word "customer" in the regulation to mean anyone who presents a check for payment. The Banks therefore deduce that given the OCC's construction of "customer", §7.4002(a) authorizes the Banks to charge the same fee which Par Value prohibits.[6]

Appellant raises two challenges to the putatively preemptive effect of §7.4002(a). Appellant asserts that Congress did not intend for the OCC to exercise its discretion in a manner which would preempt Par Value. Appellant further maintains that the

---

[5] The Banks also contend that the National Bank Act authorizes the practice as a power incident to the general "business of banking." 12 U.S.C. §24 (Seventh). However, because we find the banks' second theory dispositive of the issue, we need not reach the question of whether the fee-charging in contest here is implicitly authorized by the NBA as a power incident to the business of banking.

[6] The Banks have adopted this position upon the counsel of the OCC, which has issued to three of the Appellee Banks opinion letters advancing this view.

district court erred in deferring to the OCC's construction of §7.4002(a). We disagree on both counts.

### A. Congressional Intent

Appellant asserts that "the OCC's 'interpretation' of the NBA which would allow national banks in Texas to charge fees for cashing on-us checks...is contrary to congressional intent."  It is well settled that where Congress has spoken unambiguously as to the precise question at hand, the court must give effect to Congress's intent regardless of whether the agency entrusted to regulate the congressional mandate has adopted an alternate interpretation.  *Chevron USA Inc. v. National Resources Defense Counsel, Inc.,* 467 U.S. 837 (1984).

Appellant, however, does not argue that Congress has spoken unambiguously as to the precise question at hand - that is, whether the national banks are empowered to charge nonaccount-holding payees a check-cashing fee. Instead Appellant argues that Congress has not indicated an intention that the NBA should supplant state laws of general application.[7]  In this, though,

---

[7]Appellant also argues that the OCC's interpretation of §7.4002(a) contravenes congressional intent because Congress has manifested its intent that the OCC abstain from adopting the "field preemption" approach to state legislation which regulates banking fees. Appellant cites the Conference Committee report on the Riegle-Neal Interstate Banking and Efficiency Act of 1994. H.R. Rep. No. 103-651, at 53 (1994), *reprinted in* 140 Cong.Rec.H6638 (1994), 1994 WL 400172. However, even assuming *arguendo* that the conference committee report could potentially serve as sufficient indicia of congressional intent with respect

Appellant evidences a misapprehension of the focus of our intent inquiry here. At this stage of the preemption analysis we are concerned with whether Congress intended to delegate to the OCC the authority to authorize the nonaccount-holding payee check-cashing fee, not with whether Congress intended that state law would be preempted. As the Supreme Court has cautioned, "where state law is claimed to be pre-empted by federal regulation, a 'narrow focus on Congress' intent to supersede state law [is] misdirected'... Instead the correct focus is on the federal agency that seeks to displace state law and on the proper bounds of its lawful authority to undertake such action." *City of New York v. F.C.C.*, 486 U.S. 57, 64 (1988)(*quoting Louisiana Public Service Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986)).

---

to the precise question at hand, the particular conference committee criticism which Appellant cites was directed towards language found in 12 C.F.R. §7.8000, a rule that preceded 12 C.F.R. §7.4002(a), and was subsequently rescinded. The conference committee report quarreled with field preemption language found in §7.8000, language that is not found in §7.4002(a). To the extent the conference committee report could reasonably be said to support a conference committee opinion on the question of preemption and the NBA, it could only be limited to the opinion that the conference committee disfavors field preemption analysis when applied to state laws that conflict with the NBA.

It is significant then that, in this instance, the Banks' preemption claim is not based on a field preemption theory. The Banks' contention is that by prohibiting an activity that is otherwise authorized by §7.4002(a), Par Value *irreconcilably conflicts* with the federal regulation and is preempted by operation of the Supremacy Clause. The Banks do not rely on the argument that the NBA has occupied the field with respect to banking fee regulation, and consequently Appellant's argument concerning congressional censure of the OCC's erstwhile field preemption analysis lacks relevance.

Therefore, absent an unambiguous and on point directive from Congress, we consider Congress's intent in the context of the preemptive effect of §7.4002(a) only insofar as we must to be satisfied that Congress meant to delegate to the OCC the discretionary authority embodied in that section. And while divining the intent of Congress with respect to a point of policy not statutorily addressed is possibly aspirational under the best of circumstances, and particularly so where, as here, congressional purpose must be inferred from a vague and expansive delegation of authority to an administrative agency, we think it plain that the OCC has been delegated the authority to determine, with a considerable discretionary birth, whether and which fees the national banks may assess.[8] 12 U.S.C. §§ 1, 26-27, 481; *See, Nations Bank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256 (1995)(noting that as the agency charged with the supervision of the NBA, the OCC "bears primary responsibility for surveillance of 'the business of banking' authorized by § 24 Seventh.").

---

[8] This is of course a question separate from the question of whether Congress intended this particular fee to be authorized, but because Congress has not spoken directly on this question, we must leave the OCC's discretionary determination undisturbed. *Nations Bank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 813 (1995) (finding that where the NBA is silent or ambiguous as to the precise question at hand, and when the Comptroller of the Currency's reading of the NBA "fills a gap or defines a term in a way that is reasonable in light of the legislature's design, we give the administrator's judgment 'controlling weight'").

Appellant suggests, however, that in delegating to the OCC the authority to regulate the national banks, Congress did not intend to tacitly export to that agency the diverse range non-banking policy issues that are here implicated, concerning, for example, the negotiablity of checks, consumer protection, or even labor compensation. Nonetheless, it is often if not always the case that in exercising the discretion committed it by Congress, an agency necessarily, and perhaps even inadvertently, sweeps into its legislative reach significant policy decisions outside its area of specific commitment. In this way, the inherent limitations of any agency as congressional-delegatee are, in part, illuminated: Here, the constituency positively affected by the OCC's position is concentrated, organized and well-funded, and also happens to be the regulated industry. In contrast, the constituency which is adversely affected by the decision, though vast, is diffuse, unorganized, and definitionally ill-funded. It may be that these competing interests could better be balanced, as Appellant suggests, by a national Congress whose commitments are diverse and universal, or even by the people as they are represented in the state legislatures, than by a solitary institution whose focus is a single industry. However, our review here is limited to discerning whether Congress intended to delegate this question to the OCC, not whether we think such a delegation wise. Of course, should Congress be dissatisfied with the OCC's decision concerning the fee at issue here, Congress is

free to revisit the question with subsequent legislation. Consequently, we find that in promulgating §7.4002(a), the OCC has operated within the sphere delegated it by Congress.

### B.  Agency Deference

Finding, as we do, that in promulgating §7.4002(a), the OCC has operated within its delegated discretion, we move next to the question of whether the district court properly deferred to the OCC's interpretation of §7.4002(a). In granting summary judgment in favor of the Banks, the district court deferred to the OCC's interpretation that §7.4002(a) authorizes national banks to charge a check-cashing fee to non-account holding payees. The district court stated that, "[t]he OCC issued opinion letters...concluding that the National Bank Act and 12 C.F.R. §7.4002 (a) permit national banks to charge fees to non-account holders...the OCC is afforded deference in the interpretation of the law under which it acts, and even greater deference in its interpretation of its own regulations." *Wells Fargo Bank Texas, et al. v. James*, 184 F. Supp. 2d 588 (W.D. Tex. 2001). Appellant challenges this deference determination, and thus the relevant question before us is whether the district court was correct in finding that OCC's interpretation of  §7.4002 (a), which is undisputedly its own regulation, warrants deference under the *Chevron* line of cases. *Chevron U.S.A., Inc. v. National Res. Def. Council, Inc.,* 467 U.S. 837 (1984).

*Auer v. Robbins* offer the standard to be used where an agency interprets its own regulation. *Auer v. Robbins*, 519 U.S. 452 (1997); *see Christensen v. Harris County*, 529 U.S. 576, 588 (2000). To determine whether *Auer* deference is appropriate, the court must first consider whether the language of the regulation is ambiguous. *Id.* at 588. Here, there is no contention that the OCC's interpretation of §7.4002(a) is contrary to the plain meaning of the regulation. *See, Id.* at 588. Thus, where, as here, the regulation is ambiguous as to the precise issue in contest, an agency's interpretation of its own regulation is controlling unless it is clearly erroneous. *Auer v. Robbins,* 519 U.S. 452 (1997).

In the case at bar, the OCC has adopted the position that §7.4002 (a) authorizes national banks to charge a check-cashing fee to non-account holding payees. The regulation itself provides that national banks, "may charge its customers non-interest charges and fees" for authorized services. There is no dispute that check-cashing is a service which national banks are authorized to provide. The primary ambiguity lies in whether non-account holding payees are "customers" for the purpose of the regulation. The OCC interprets "customers" to include any person who presents a check for payment. Certainly this is not the only reasonable interpretation of §7.4002 (a), and it is perhaps not even the most natural reading of "customer." For example, one might easily understand "customer" to be include primarily those

13

individuals with whom the Banks exchange services and remunerations, rather than payees seeking payment for executory negotiable instruments. Nevertheless, we find it neither unwarranted nor unreasonable to define customer as anyone who seeks payment for a check from the bank. In doing so, the payee avails himself of the servants and services of the bank. We conclude, therefore, that the OCC interpretation is not a clearly erroneous interpretation, and the district court properly deferred to it.

In sum, the OCC's interpretation that "customer" includes payees who present a check to a drawee bank for payment due is controlling. Consequently, the national banks are authorized by federal regulation 12 C.F.R. §7.4002 (a) to charge nonaccount-holding payees a check-cashing fee. Thus, because it prohibits the exercise of a power which federal law expressly grants the national banks, Par Value is in irreconcilable conflict with the federal regulatory scheme, and it is preempted by operation of the Supremacy Clause. U.S. Const., Art. VI, cl. 2; *Barnett Bank of Marion Co. v. Nelson*, 517 U.S. 25 (1996).

## III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

14