#24135-rev & rem-DG

**2007 SD 32**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

NORTHWESTERN SERVICES
CORPORATION,                                              Plaintiff and Appellant,

 v.

SI-TANKA HURON UNIVERSITY,                    Defendant,
  and
WELLS FARGO BANK SOUTH DAKOTA,
N.A., (f/k/a Marquette Bank, N.A.),              Defendant and Appellee.

\* \* \* \*
APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BEADLE COUNTY, SOUTH DAKOTA

\* \* \* \*
HONORABLE JON R. ERICKSON
Judge
\* \* \* \*

DONALD T. CAMPBELL of
Leonard, Street and Deinard, P.A.
Minneapolis, Minnesota

STEPHEN C. LANDON of
Cadwell, Sanford, Deibert & Garry
Sioux Falls, South Dakota                         Attorneys for plaintiff
                                                                  and appellant.

THOMAS J. WELK
MICHAEL F. TOBIN of
Boyce, Greenfield, Pashby & Welk
Sioux Falls, South Dakota                         Attorneys for defendant
                                                                  and appellee.

\* \* \* \*

ARGUED JANUARY 10, 2007

OPINION FILED **03/28/07**

#24135

GILBERTSON, Chief Justice

[¶1.]		On February 2, 2004, Northwestern Services Corporation (NSC) commenced an action in the South Dakota Third Judicial Circuit for breach of contract against Si-Tanka Huron University (Si-Tanka) and to enforce a guarantee by Wells Fargo Minnesota, N.A. (Wells Fargo).  On June 2, 2005, NSC filed a motion for summary judgment against Wells Fargo.  On October 21, 2005, Wells Fargo filed a cross-motion for summary judgment against NSC.  A hearing was held on the motions on January 23, 2006.  The circuit court issued its memorandum opinion on April 21, 2006, granting Wells Fargo's motion and denying NSC's.  On May 2, 2006, the order on the motions was filed and judgment in favor of Wells Fargo was entered.  We reverse and remand for proceedings consistent with this opinion.

**FACTS AND PROCEDURE**

[¶2.]		The facts upon which our review of this appeal is based are not in dispute.  In September 1999, Marquette Bank, N.A. (Marquette) issued a loan to Newco, LLC (Newco) for the purchase of Huron University (the University), located in Huron, South Dakota.  The amount of the loan was $3.6 million.  Prior to the transaction, Newco owned the heating, ventilation and air-conditioning system (HVAC) installed at the University.

[¶3.]		Contemporaneous with its purchase of the University, Newco negotiated a sale-lease-back agreement with NSC for the HVAC.  The terms of the agreement were memorialized in the Facility Management Contract, dated September 1, 1999 (FMC).  In addition to NSC and Newco, Marquette was also a signatory to the contract.

[¶4.]     The terms of the FMC provided that NSC would pay $250,000.00 for the HVAC. Newco agreed to lease back the HVAC from NSC at a stated monthly installment. The installment included not only the cost of the equipment lease, but also provided for maintenance and the cost of natural gas to be supplied by NSC. In addition, NSC at its discretion was permitted to upgrade the HVAC at a cost of up to an additional $250,000.00. The term of the lease was fifteen years. At the end of the term, Newco could purchase the original HVAC for $1.00 and any upgrade equipment at its retail price less accumulated straight-line depreciation. In anticipation of the HVAC transaction, on August 11, 1999, Marquette's credit committee approved the loan to Newco with the infusion of the $250,000.00 purchase funds from NSC. NSC paid the $250,000.00 for the purchase of the HVAC from Newco, directly to Marquette. Marquette applied the funds to pay down Newco's loan.

[¶5.]     The FMC also included a "Buyout Provision" that would trigger in the event Newco defaulted on the lease or became subject to lender foreclosure. The provision stated that Marquette would purchase the HVAC from NSC if the buyout was triggered. Marquette's purchase price would be calculated by taking the retail price of the original equipment, valued at $250,000.00, and the retail value of any upgrade equipment, less the accumulated straight-line depreciation of each component. Since it was agreed that upgrades would not exceed $250,000.00, Marquette's purchase price could not exceed $500,000.00.[1] Marquette's loan-to-

---

1.     In fact NSC did invest $250,000.00 in upgrades shortly after it purchased the HVAC.

value (LTV) analysis contemplated a maximum LTV ratio of 66.5% based on the market value of the University assets less Marquette's maximum buyout purchase price of $500,000.00. Marquette's loan approval documents included a discussion of the risk minimizing benefits of the HVAC transaction for its loan to Newco weighed against Marquette's maximum exposure of $500,000.00, in the event the HVAC buyout provisions were triggered.

[¶6.] In April 2001, the Cheyenne River Sioux Tribe purchased the University from Newco and changed its name to Big Foot (Si-Tanka) College (herein collectively referred to together with Si-Tanka Huron University as "Si-Tanka").[2] On April 26, 2001, Marquette and Si-Tanka executed a loan agreement in the principal amount of $3.3 million for the purchase. This agreement expressly provided that Si-Tanka would "assume the rights, duties and obligations owed to [NSC] . . . by Newco . . . pursuant to the terms of the [FMC]." On that same day, NSC, Si-Tanka, Newco, Marquette and the United States Department of Agriculture[3] executed a document entitled "Consent to Assume" (the Consent). The Consent included NSC's consent to Si-Tanka's assumption of the terms of the FMC. The Consent also restated the continuing obligations of the parties under the FMC as well as "their successors and assigns."

---

2. "Bigfoot (Si-Tanka) College" is a non-profit corporation registered with the South Dakota Secretary of State and established by the Cheyenne River Sioux Tribe to operate the University under the name Si-Tanka Huron University.

3. Si-Tanka received an additional $3.3 million loan, for the purchase of the University, from the United States Department of Agriculture, Rural Housing Service.

[¶7.]    After making several monthly installment payments as required under the FMC, Si-Tanka discontinued making payments in October 2001. As required by the FMC, on January 14, 2003, NSC sent Si-Tanka notice of default with 30 days to cure. During the intervening time, Marquette was acquired by Wells Fargo.[4] When Si-Tanka failed to cure, NSC sent notice to Wells Fargo on February 14, 2003, of its intent to exercise its option to invoke the buyout provisions of the FMC, thus compelling Wells Fargo to purchase the HVAC. NSC calculated the purchase price, based on the value of the HVAC and upgrade equipment less accumulated strait-line depreciation, to be $450,000.00. Under the terms of the FMC, Wells Fargo had six months to satisfy its purchase obligations. Having failed to do so, NSC initiated an action in the South Dakota Third Judicial Circuit against Wells Fargo on February 2, 2004, alleging breach of a guarantee for failure to perform its purchase obligations under the FMC. After NSC and Wells Fargo filed cross-motions for summary judgment, the circuit court entered its order on the motions and judgment in favor of Wells Fargo on May 2, 2006. NSC appeals raising the following issue:

> Whether Wells Fargo's obligation, to purchase the HVAC when Si-Tanka defaulted on its lease obligations under the FMC, was an enforceable guarantee.

**STANDARD OF REVIEW**

> Under our familiar standard of review in summary judgment cases, we decide only whether genuine issues of material fact exist and whether the law was correctly applied. If any legal basis exists to support the trial court's ruling, we will affirm. "With the material facts undisputed, our review is limited to determining whether the trial court correctly applied the law." Kobbeman v. Oleson, 1998 SD 20, ¶4, 574 NW2d 633, 635.

---

4.    Wells Fargo acquired Marquette in February 2002.

Schulte v. Progressive Northern Ins. Co., 2005 SD 75, ¶5, 699 NW2d 437, 438 (internal citations omitted).

## ANALYSIS AND DECISION

[¶8.] **Whether Wells Fargo's obligation, to purchase the HVAC when Si-Tanka defaulted on its lease obligations under the FMC, was an enforceable guarantee.**

[¶9.] There is no dispute as to the fact that at all times relevant both Marquette and Wells Fargo were nationally chartered banks. Wells Fargo argues that as national banks, neither Marquette nor Wells Fargo was statutorily authorized to guarantee the obligations of the FMC lessee. Wells Fargo contends that the buyout provision of the FMC, obligating it to purchase the HVAC in the event of lessee default, constituted a guarantee of a third party obligation – here originally that of Newco whose lease obligations were assumed by Si-Tanka. As such, Wells Fargo avers that Marquette's agreement to be obligated under the buyout provision, subsequently assumed by Wells Fargo when it acquired Marquette, is *ultra vires* and thus unenforceable.

*The General Rule*

[¶10.] We have observed that national banks derive their authority to conduct business from 12 USC § 24. Western Petroleum Co. v. First Bank Aberdeen (NA), 367 NW2d 773, 777 (SD 1985). The authority to guarantee the debts of another is not provided within this statute. *Id*. "It is therefore generally held that 'a national bank cannot lend its credit by guaranteeing the debt of another solely for his benefit.'" *Id*. at 777-78 (quoting 9 CJS *Banks and Banking* § 661, at 1214 (1938)) (additional citations omitted). Many venerable cases have recognized this

principle. *See* Federal Intermediate Credit Bank of Omaha v. L 'Herisson, 33 F2d 841, 847 (8thCir 1929) (citations omitted) (noting that a national bank does not have the statutory authority, even when solvent, to lend its credit for the benefit of another); Merchants' Bank of Valdosta v. Baird, 160 F 642, 646 (8thCir 1908) (holding that a guarantee by a national bank, to honor checks of its depositor within a given period and without regard to amount, was an unenforceable loan of the bank's credit where the bank had no interest in the obligations created therein by the depositor); Commercial Nat'l Bank v. Pirie, 82 F 799, 801-02 (8thCir 1897) (recognizing that the federal law authorizing the organization of national banks confers upon them no authority to guarantee the payment of debts contracted by a third person for his benefit and that acts of this nature are necessarily *ultra vires*); Bowen v. Needles Nat'l Bank, 94 F 925, 931 (9thCir 1899) (holding *ultra vires* a national bank's guarantee to pay all checks of a third person, although such person had no funds on deposit); Thilmany v. Iowa Paper-Bag Co., 79 NW 68, 69 (Iowa 1899) (holding that a national bank's guarantee for the fulfillment of the obligation of another is not authorized unless such guarantee is made in connection with the transfer of a chose in action or other property belonging to the bank); First Nat'l Bank v. American Nat'l Bank, 72 SW 1059, 1061 (Mo 1903) (disagreed with on other grounds) (holding a national bank has no power to bind itself that a draft drawn on its customer will be paid, and when sued on such a contract, it can plead *ultra vires*).

*Exceptions to the General Rule*

[¶11.]      While it is clear that a national bank may not merely lend its credit or guarantee the obligations of another solely for the other's benefit, there are circumstances in which a bank may issue a guarantee.  In *People's Bank v. National Bank*, 101 US 181, 181, 25 LEd 907 (1879), a national bank's debtor made a note payable to himself and then endorsed it to the order of a third party.  The debtor delivered the note to the bank, which then negotiated it to the third party with an additional guarantor's endorsement.  The bank then applied the proceeds to credit the account of the debtor.  The United States Supreme Court held that such a contract of guarantee is within the implied statutory powers of a national bank and thus the bank had issued an enforceable guarantee.  *Id*. at 183, 25 LEd 907.  *See also* Cochran v. United States, 157 US 286, 297, 15 SCt 628, 632, 39 LEd 704 (1895) (citing *People's Bank, supra*) (restating the principle that national banks have the implied statutory authority to make contracts of guarantee).

[¶12.]      The court in *Dunn v. McCoy*, 113 F2d 587 (3dCir 1940) addressed the absence of an express statutory provision granting national banks the authority to make contracts of guarantee.  The court noted that such absence "has not prevented the enforcement of guaranties which the courts would characterize as having been entered into by banks for the furtherance of their own rights or as an incident to the transaction of their own business."  *Id*. 589 (citations omitted).  Recognizing the justification for enforcement under such circumstances as a "flexible rule," the court further observed, "it is clear that in order to protect authorized loans, a bank may

ordinarily guarantee to its debtors' other creditors that their preexisting or subsequently created loans will be paid." *Id*. (citations omitted).

[¶13.]     The federal regulations governing banks and banking are more explicit in their grant of guarantor authority to national banks.  12 CFR § 7.1017 provides:

> A national bank may lend its credit, bind itself as a surety to indemnify another, or otherwise become a guarantor . . . if:
>
> (a)     The bank has a *substantial interest* in the performance of the transaction involved . . .

(Emphasis added).

[¶14.]     The Office of the Comptroller of the Currency (OCC) has issued several interpretive letters addressing the issue of what constitutes a substantial interest. The United States Supreme Court has noted that deferential treatment is to be afforded the regulatory interpretations of government agencies.  NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co., 513 US 251, 256-57, 115 SCt 810, 813, 130 LEd2d 740 (1995) (citations omitted).  Charged with enforcement of federal banking laws, the OCC is to be afforded deference with respect to regulatory interpretations.  *Id*. (citations omitted).  This doctrine was recently confirmed in Smiley v. Citibank (South Dakota), N. A., 517 US 735, 116 SCt 1730, 135 LEd2d 25 (1995) wherein the Court held:

> It is our practice to defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering. As we observed only last Term, that practice extends to the judgments of the Comptroller of the Currency with regard to the meaning of the banking laws.  "The Comptroller of the Currency," we said, "is charged with the enforcement of banking laws to an extent that warrants the invocation of [the rule of deference] with respect to his deliberate conclusions as to the means of these laws." NationsBank

> of N.C., N.A. v. Variable Annuity Life Ins. Co., 513 US 251,
> 256-57, 115 SCt 810, 813, 130 LEd2d 740 (1995).

*Id.* at 738, 116 SCt at 1733, 135 LEd2d 25 (internal citation omitted).

[¶15.]     Mindful of this deferential standard of interpretation, we note that the

OCC, interpreting 12 CFR § 7.1017, has concluded:

> A "substantial interest" exists if the guarantee provided by
> the bank is *incidental* to an authorized activity.  To put it
> another way, the nexus between the bank permissible
> transaction and the guarantee provides the substantial
> interest for the bank.

OCC Interp. Ltr. 1022 (Feb. 15, 2005), 2005 WL 1939709 (citations omitted)

(emphasis added); OCC Interp. Ltr. 1014 (Jan. 10, 2005), 2005 WL 1939716

(citations omitted); OCC Interp. Ltr. 929 (Feb. 11, 2002), 2002 WL 432437 (citations

omitted); OCC Interp. Ltr. (June 4, 1993), 1993 WL 740922 (citations omitted).

[¶16.]     In *Arnold Tours, Inc. v. Camp*, 472 F2d 427 (1stCir 1972), it was held

"that a national bank's activity is authorized as an *incidental power*, 'necessary to

carry on the business of banking,' within the meaning of 12 USC § 24, Seventh, *if it

is convenient or useful in connection with the performance of one of the bank's

established activities* pursuant to its express powers under the National Bank Act."

*Id.* at 433 (quoting 12 USC § 24, (Seventh)) (emphasis added).[5]  The OCC has

---

5.     We also take note that subsequent to the First Circuit Court of Appeals
       decision in *Arnold Tours Inc.*, the United States Supreme Court expanded
       the scope of that decision by holding that the "business of banking" is not
       limited to the enumerated powers of 12 USC § 24 (Seventh), but that the
       Comptroller of the Currency has, within reasonable bounds, the discretion to
       authorize activities beyond those specifically enumerated.  NationsBank of
       North Carolina, N.A. v. Variable Annuity Life Ins. Co., 513 US 251, 258 n2,
       115 SCt 810, 814 n2, 130 LEd2d 740 n2 (1995).

subsequently recognized the *Austin* court's interpretation of "incidental power."

OCC Interp. Ltr. 1014 (Jan. 10, 2005), 2005 WL 1939716; OCC Interp. Ltr. No. 742

(Aug. 19, 1996); OCC Interp. Ltr. No. 737 (Aug. 19, 1996). Similarly, this Court has

noted that a national bank's guarantee of the debt of another is permissible "if done

in the ordinary course of banking or if 'it owns or has an interest in the obligation

guaranteed.'" *Western Petroleum Co.*, 367 NW2d at 778 (quoting 7 Michie, *Banks*

*and Banking* § 163, at 279-80 (1980)).[6]

---

6.     Our decision in *Western Petroleum Co.*, 367 NW2d 773 preceded 12 CFR § 7.1017 and the recent OCC Interpretive Letters. Although the language we used in *Western Petroleum Co.*, is not technically the same as the "substantial interest" language utilized in 12 CFR § 7.1017, as interpreted by the OCC, it does nonetheless recognize the same principle.

    In noting that a bank has to be more than interested in the success of its debtor before it can issue an enforceable guarantee of its debtor's obligations, *id.* at 779 (citing Rice & Hutchins Atlanta Co. v. Commercial Nat'l Bank, 88 SE 999, 1000 (1916), we held that a national bank's guarantee that its customer would pay vendor invoices was not enforceable because the bank did not have an interest in and was not benefited by the vendor goods. *Id.* Specifically, the would-be guarantor received no consideration for its letter of guarantee; no property was transferred to it; no security interest was created and no direct pecuniary interest arose in it. *Id.* To put it another way, in *Western Petroleum Co.*, there was no nexus between the bank-permissible transaction (the borrower-lender relationship between the bank and its customer) and the guarantee of the customer's agreement to pay vendor invoices. *See* OCC *Interpretive Letters supra.* In reaffirming the continued applicability of our decision in *Western Petroleum Co.*, we hereby for the sake of consistency adopt the "substantial interest" language of 12 CFR § 7.1017, as interpreted by the OCC, as the standard by which the enforceability of national bank guarantees are determined.

*The FMC "Buyout Provisions"*

[¶17.]    Wells Fargo argues that it received nothing from NSC to validate its guarantee to purchase the HVAC in the event of lessee default.  It further argues that the guarantee is invalid because the payment of the HVAC purchase price from NSC to the bank was merely inherent to its normal lender-borrower relationship with Si-Tanka.  We disagree.

[¶18.]    That NSC's payment of the HVAC purchase price to the bank was inherent to a normal lender-borrower relationship of Wells Fargo alone establishes the validity of the guarantee.  Loaning money for the purchase of the University was an authorized activity for Wells Fargo.  NSC's $250,000.00 payment directly to the bank that was applied as credit against the loan balance was convenient and useful in connection with Wells Fargo's performance of its authorized activity of lending money.  Wells Fargo's guarantee that it would purchase the HVAC from NSC in the event of lessee default was an inducement for NSC to enter into the FMC, hence giving rise to the payment.  As such, the guarantee was incidental to Wells Fargo's authorized activity of lending money for the purchase of the University.  Therefore, Wells Fargo had a substantial interest in making the guarantee.

[¶19.]    Wells Fargo similarly had a substantial interest in making the guarantee from the standpoint that the building infrastructure collateral for the University loan had more value with the guarantee than without.  Had NSC entered into the FMC absent Wells Fargo's guarantee, NSC would have been entitled to repossess the HVAC when Si-Tanka defaulted.  Wells Fargo attempts to

claim that the guarantee added no value to the loan collateral by evincing its perfected security interest in all University property. However, Wells Fargo overlooks the fact that it was anything but assured to garner sufficient proceeds on a foreclosure sale to cover the outstanding loan balance. Absent a functioning HVAC, the likelihood of a full recovery at foreclosure would have been even more remote. Since the guarantee did add value to the collateral it was likewise convenient and useful to the loan and thus incidental to that authorized activity. Consequently, Wells Fargo also had a substantial interest in making the guarantee from this perspective.

[¶20.] Although the enforceability of Wells Fargo's guarantee is evident from this analysis, we also deem it necessary to address Wells Fargo's claim that it received nothing from the HVAC transaction. First and obviously, the bank received cash in hand from NSC that it applied against the loan balance thereby reducing its exposure and increasing its equity in the loan by $250,000.00. Second, as discussed, the bank benefited from the value added to the collateral by the guarantee. Third, Wells Fargo benefited from NSC's additional expenditures made in upgrading the HVAC.

[¶21.] The second benefit is not quantifiable. However, the first and the third are completely quantifiable as evident from the "buyout provisions" of the FMC. That Wells Fargo and its predecessor, Marquette, were cognizant of these benefits is obvious from the credit committee's August 11, 1999 loan approval that made reference to the anticipated $250,000.00 payment from NSC. This cognizance is further demonstrated by the loan approval documents that show, as part of the

loan approval process, Wells Fargo considered the weight of the maximum potential buyout price against the risk minimizing benefits of the HVAC transaction.

[¶22.] Wells Fargo received $250,000.00 in cash, based on the retail price of the HVAC, thus improving its equity position in the loan. NSC invested an additional $250,000.00 that enhanced the value of the HVAC to Wells Fargo on buyout. Less straight-line depreciation, Wells Fargo realized a quantifiable benefit of $450,000.00 and its guarantee is enforceable to that extent.

[¶23.] We reverse and remand for further proceedings consistent with this opinion.

[¶24.] SABERS and MEIERHENRY, Justices, and MILLER, Retired Justice, concur.

[¶25.] ZINTER, Justice, concurs in result.

[¶26.] MILLER, Retired Justice, sitting for KONENKAMP, Justice, disqualified.

ZINTER, Justice (concurring in result).

[¶27.] I agree that the guarantee was not *ultra vires*. In my view, it was a lawful activity even without relying on the $250,000.00 payment that was used to reduce the amount of the initial loan. The guarantee was lawful simply because the Facilities Management Contract (FMC) was in furtherance of Marquette/Wells Fargo's own rights and it was an integral part of Marquette/Wells Fargo's authorized lending transaction with the University's owners.

[¶28.] First, the FMC was in furtherance of Marquette/Wells Fargo's own rights. It has not been specifically mentioned that Marquette/Wells Fargo

-13-

apparently did not have a first security interest in the HVAC, water heating, kitchen, and lighting equipment at the University.[7] And, there is no dispute that such equipment was indispensable to the functional viability of Marquette/Wells Fargo's collateral; *i.e.* the University and its physical plant. Therefore, on the limited record we have before us, in the event of default, it was through the FMC that Marquette/Wells Fargo acquired a right to obtain the equipment that was indispensable to making its collateral viable.[8]

[¶29.]	Second, the FMC was an integral part of the University loan. As a part of the loan, Marquette/Wells Fargo made a default on the FMC a default on the loan. Furthermore, Marquette/Wells Fargo acknowledged that the FMC

---

7.	The Court appears to suggest that Marquette/Wells Fargo did have a security interest in the HVAC system. *See supra*, ¶18. However, at the hearing on the motions for summary judgment, Northwestern specifically indicated "that Wells Fargo did not have a security interest in the HVAC system." And, Marquette/Wells Fargo did not dispute that assertion at the hearing. Moreover, although there is no dispute that Marquette/Wells Fargo had a blanket security interest in buildings and equipment, Marquette/Wells Fargo has not disputed Northwestern's numerous statements in its brief that, when Si-Tanka defaulted on the FMC, Northwestern was entitled to repossess the equipment. Therefore, although the record is not clear, it appears that at a minimum, any Marquette/Wells Fargo security interest in the equipment at issue was inferior to Northwestern's rights in the collateral.

8.	No argument has been raised regarding "fixtures" and the potential incorporation of Northwestern's equipment into Marquette/Wells Fargo's collateral and security interest. The parties have treated the equipment as severable and removable from the Marquette/Wells Fargo's collateral. Therefore, as the parties have, we must assume the equipment was removable and not subject to a first security interest of Marquette/Wells Fargo. Moreover, although Marquette/Wells Fargo does note that it was secured on the "property of the University," Marquette/Wells Fargo does not argue that it was fully secured or over-secured. Consequently, Marquette/Wells Fargo had a substantial interest in the equipment at issue.

transaction was important to maintain the equipment and minimize its risk. The loan approval documentation specifically indicated that the FMC transaction was being pursued in "an effort to minimize risk in the maintenance of the HVAC system." Obviously, by entering into the FMC, Marquette/Wells Fargo was being assured that the equipment necessary to make its collateral valuable would be maintained (and actually updated), increasing the likelihood of the University's success and improving the chances that the loan would be repaid.

[¶30.] I would simply hold that these two interests were "substantial," *i.e.* "incidental" to Marquette/Wells Fargo's authorized lending activities within the meaning of 12 CFR § 7.1017 and the relevant OCC decisions cited by the Court. *See supra*, ¶15. Therefore, Marquette/Wells Fargo was authorized to guarantee the FMC, and the judgment of the circuit court must be reversed.

[¶31.] Regarding the remand, I would note that it may include consideration of Marquette/Wells Fargo's contractual defenses of lack of consideration and lack of officer authority to enter into the contract. Marquette/Wells Fargo raised these issues before the circuit court. However, because the circuit court's summary judgment was based solely upon a national bank's authority to guarantee the FMC, these contractual defenses were not considered. In its appellate brief, Marquette/Wells Fargo also requests a remand to challenge whether the FMC constitutes a guarantee. It does not appear this issue was raised before the circuit court. I would leave it to the circuit court to determine whether that issue was preserved by presenting it below.